PLAINTIFF
**EXH. 1**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MICHAEL JACOBS and
RUBY HANDLER JACOBS

     Plaintiffs,

     vs.                                Case. no. 1:21-cv-00690-MV-SCY

THE JOURNAL PUBLISHING COMPANY          DEMAND FOR JURY TRIAL
*d/b/a* THE ALBUQUERQUE JOURNAL;
WILLIAM P. LANG; NICOLE PEREZ; JAMES
THOMPSON; ELISE KAPLAN; KAREN
MOSES; DEAN HANSON; KENT WALZ;
MORGAN PETROSKI; and DOES 1 THROUGH 20;
INDIVIDUALLY OR JOINTLY and
SEVERALLY

     Defendants.

---

**THIRD AMENDED COMPLAINT FOR COPYRIGHT VIOLATION, THEFT AND
CONVERSION, TRESPASS, INVASION OF PRIVACY AND INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS, WITH DEMAND FOR JURY TRIAL**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

     **COMES NOW**, *pro se[1]* Plaintiffs Michael Jacobs and Ruby Handler Jacobs ("Plaintiffs"

or the "Jacobses"), filing this Third Amended Complaint (the "Third Amended Complaint")

against William P. Lang ("Lang") the Journal Publishing Company *d/b/a* as the *Albuquerque

Journal* ("*Journal*"), Nicole Perez ("Perez"), James "Jim" Thompson ("Thompson"), Elise

Kaplan ("Kaplan"), Karen Moses ("Moses"), Dean Hanson ("Hanson"), Kent Walz ("Walz"),

Morgan Petroski ("Petroski") and Does 1 through 20 ("Does").  Plaintiffs allege as follows:

---

[1]  The Supreme Court found that *pro se* pleadings should be held to "less stringent standards" than those
drafted by attorneys. *Haines v. Kerner*, 404 U.S. 520 (1971), *Puckett v. Cox*, 456 F. 2d 233 (1972) (6th
Cir. USCA).

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

2.     This Court has federal question jurisdiction over this claim because Defendants' copyright infringement violated the Federal Copyright Act, 17 U.S.C. § 101, et seq.

3.     This Court has federal question jurisdiction over this claim because Defendants' copyright infringement violated the Federal Copyright Act, 17 U.S.C. § 501.

4.     This Court has federal question jurisdiction over this claim Contributory Copyright Infringement 17 U.S.C. § 106.

5.     This Court has federal question jurisdiction over this claim. Plaintiffs alleges copyright infringement under the Federal Copyright Act, 17 U.S.C. § 1202(a) and (b) (Digital Millennium Copyright Act of 1988 ("DMCA")).

6.     Title 17, Chapter 12 Copyright Law of the United States provides that any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation (17 U.S.C. § 1202(a)).

7.     Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State and the amount at stake is more than $75,000 is a diversity of citizenship case.

8.     This Court has Ancillary jurisdiction under 28 U.S.C. §1367(a) which allows a federal court to hear a claim that would normally be outside of its subject-matter jurisdiction if it is substantially related to a claim that is within the court's jurisdiction.  A claim comes within a federal court's ancillary jurisdiction when it bears a logical relationship to the aggregate core of operative facts of the main claim.   Ancillary jurisdiction has been replaced entirely by

supplemental jurisdiction, per 28 U.S.C. § 1367(b), part of the U.S. supplemental jurisdiction statute.

## VENUE

9.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), in that the Plaintiffs reside within this District.  Further, Defendants transact business in, and their conduct as averred in this Complaint, occurred in this District and the State of New Mexico.

## THE PARTIES TO THIS COMPLAINT

### The Plaintiffs

10.    Plaintiff Michael Jacobs ("Plaintiff Jacobs") is a private adult resident of Albuquerque, Bernalillo County, and a citizen of New Mexico. Plaintiff Jacobs has been an award-winning professional photojournalist and member of the press for over fifty years and is in the business of licensing his photographs to online and print media for a fee.  Plaintiff Jacobs studied mass communication law at California State University, Hayward.  He has been an instructor and adjunct professor in journalism for more than twenty five years. Plaintiff Jacobs was also an adjunct professor at the University of California Los Angeles for six years and taught photojournalism, which included mass communication law. Copyright and ownership of photography was an integral part of his course which included the fair use doctrine. During Plaintiff Jacobs' extensive photography career, he was a Pacific Fleet Combat Cameraman in U.S. Navy during Vietnam, then rose to photograph many V.I.P.s, celebrities, politicians -  including eight U.S. Presidents - religious leaders, authors, and Royalty from a half dozen European countries.  This required many years of Secret Service clearance.  And Plaintiff Jacobs' photographs have been published in most of the world's leading newspapers and magazines spanning decades.  He is also an award-winning motion picture director.

11.     Plaintiff Ruby Handler Jacobs ("Plaintiff Handler Jacobs") is a private adult resident of Albuquerque, Bernalillo County, and a citizen of New Mexico. Plaintiff Handler Jacobs had been involved in law enforcement for thirty years including a near decade as a Contract Deputy of the United States Marshal Service ("USMS"). She is also P.O.S.T. Certified (Peace Officers Standard and Training) and operated a Private Security company ("PPO"), licensed in California and New Mexico for sixteen years. Ms. Handler Jacobs's father was in the newspaper business and thus she grew up amongst that milieu. Further, she also worked for the notable journalist, James Reston, at his newspaper on Martha's Vineyard and is familiar with editorial protocols. Ms. Handler Jacobs was editor of a national magazine distributed by Curtis Circulation. She also has a background in real estate development and financial packaging, representing many elite clients. Additionally, she has been a member of SAG/A.F.T.R.A (Screen Actors Guild and American Federation of Television and Radio Artists) for 45 years and is an award-winning producer.

12.     Plaintiffs reside at 800 Calle Divina NE, Albuquerque, NM 87113 (the "Property").

### The Defendants

13.     **DEFENDANT *JOURNAL*** (that refers jointly to the Journal Publishing Company and the publication *Albuquerque Journal* herein) is a for profit media corporation organized and existing under the laws of the State of New Mexico with its' principal offices at 7777 Jefferson Street NE, Albuquerque, NM 87109.

14.     Plaintiffs are informed and therefore believes, and thereon alleges that, at all times herein mentioned, each of the following Defendants sued was an agent and/or employee of the *Journal* and was at all times of the violations acting either within the purpose and scope of such agency and employment or acting outside the scope of their employment.

15. Plaintiffs are informed and therefore believes that **DEFENDANT LANG** is an adult resident of Corrales, New Mexico and is currently employed by the *Journal* as its' publisher[2].

16. Plaintiffs are informed and therefore believe that **DEFENDANT PEREZ** is an adult resident of San Francisco, California and was employed by the *Journal* as a journalist on or about December 15, 2016. She is believed to be currently employed by Wood Thumb at 173 Shipley Street, San Francisco, CA 94107.

17. Plaintiffs are informed and therefore believe that **DEFENDANT THOMPSON** is an adult resident of Albuquerque, New Mexico and is currently retired from the *Journal* as a photographer. Thompson was an employee of the *Journal* on or about December 15, 2016.

18. Plaintiffs are informed and therefore believe that **DEFENDANT PETROSKI** is an adult resident of Albuquerque, New Mexico and is currently retired from the *Journal* as its Photo Editor since January 2017. Petroski was an employee of the *Journal* on or about December 15, 2016.

19. Plaintiffs are informed and therefore believe that **DEFENDANT HANSON** is an adult resident of Albuquerque, New Mexico and was employed at the *Journal* as its Photo Editor between January 2017 and June 2021 when he retired.

20. Plaintiffs are informed and therefore believe that **DEFENDANT KAPLAN** is an adult resident of Albuquerque, New Mexico and currently employed by the *Journal* as a Staff Writer. Kaplan was an employee of the *Journal* on or about December 15, 2016.

---

[2] Under the legal theories of vicarious liability and *respondeat superior*, a business is responsible for the acts of its employees, when those acts are done in the scope of employment or in the course of business. A newspaper publisher is defined by Dictionary.com as the business head of a newspaper organization or publishing house, commonly the owner or the representative of the owner.

21.    Plaintiffs are informed and therefore believe that **DEFENDANT MOSES** is an adult resident of Albuquerque, New Mexico and was employed by the *Journal* as its' Editor in Chief until retiring on or about  June 1, 2023, and was the Managing Editor at the time in question of this Complaint.

22.    Plaintiffs are informed and therefore believe that **DEFENDANT WALZ** is an adult resident of Albuquerque, New Mexico and is currently retired from the *Journal* as its Editor in Chief on or about January 30, 2017.   Waltz was an employee of the *Journal* on or about December 15, 2016 and remains with the *Journal* as a senior editor.

23.    Plaintiffs are uninformed of the true names and capacities of defendants sued herein as **DOES 1 through 20** inclusive, and therefore sues these defendants by such fictitious names. Plaintiffs will amend[3] this Complaint to allege their true names and capacities if and when ascertained.

24.    Hereinafter the parties referenced above shall be collectively referred to as "Defendants" and singularly by individual names.

## FACTUAL BACKGROUND

25.    Due to a relationship of inveiglement and deception by an international con artist, Sri Lankan Rienzie Mahesh Kumara Edwards ("Edwards"), on December 11, 2016, Plaintiffs were arrested per a warrant as a result of a sealed Federal Indictment referred to a case entitled *United States v. Edwards et. al.* ("NY Case")[4].  Plaintiff Jacobs was detained at Los Angeles International Airport, California – on his way to Madrid, Spain for a meeting with Edwards to fund his photo gallery project - while Plaintiff Handler Jacobs was detained in Albuquerque, New Mexico and reachable by the *Journal* on or about December 15, 2016.  The NY Case,

---

[3] This Amended Complaint contains three individuals discovered after the original Complaint was filed.
[4] Southern District of New York, Case No. 16-cr-00800.

which wrongly charged the Jacobses, has been closed since July 19, 2019 for Plaintiff Jacobs and September 6, 2019 for Plaintiff Handler Jacobs.

26.     Plaintiffs are informed and therefore believe that on or about December 15, 2016, Defendant *Journal* initially published an online article (*See* Doc. 1-1, Exhibit 1) concerning Plaintiffs which then appeared in its' hard copy ("print edition") on December 16, 2016.  The articles includes one central photographic image (the "Cannes photograph").   The print edition was also available on the *Newspapers.com* website (*See* Doc. 1-1, Exhibit 2) and *pressreader.com* (*See* Exhibit 1).  Plaintiffs were not aware, nor could become aware, of any of the *Journal* publications until first discovered on or about September 28, 2019 by Plaintiff Jacobs, per date stamp on Doc. 1-1, Exhibit 1. The discovery was made when Plaintiff Jacobs did an Internet search following being informed by (now deceased) Albuquerque resident Mr. Murray Elowitz, MS ("Mr. Elowitz.")  Moreover, the *Journal* posted the Cannes photograph on their Facebook page alongside defamatory statements which also placed Plaintiffs in false light, and invaded Plaintiffs privacy, that was not discovered by Plaintiff Jacobs until on or about August 29, 2020. (*See* Doc. 1-1, Exhibit 3).



This photo of Ruby Handler-Jacobs, left, and Michael Jacobs, was found at their Northeast Albuquerque home Thursday.

*Copyright © 2016 Albuquerque Journal*

7

27.     The underlying nature of the *Journal* article (hereinafter referred to as the "Jacobs Article") concerned accusations filed against Plaintiffs in the NY Case on or about December 12, 2016 which has since been concluded.  Said Jacobs Article, hereinafter to be referred to as containing the "defamatory material" and the Cannes photograph, was authored by Defendants Perez and Kaplan (hereinafter together referred to as the "writers") with a number of photographs taken by Defendant Thompson, and all allegedly approved for publication by editor Defendants Petroski, Walz and Moses.

28.     Plaintiffs allege that Defendants Perez and Thompson did willfully trespass on their "Private Property: No Trespassing" signed Property (the "Sign") in violation of NM Statute § 30-14-1(A) on or about December 15, 2016 (hereinafter referred to as the "criminal trespass") (*See* Doc. 1-1, Exhibit 4).

29.     The defamatory material includes the Cannes photograph, depicting Plaintiffs standing in front of grand yachts[5], that Plaintiffs aver was stolen from a frame in their home during the criminal trespass and trespass on chattel prior to publication.  The trespass on chattel continues with the *Journal* willfully not returning the Jacobses property following a demand letter dated December 14, 2019 (*See* ¶¶ 33,38,50,58 hereinbelow)

30.     For Defendants Thompson and Perez to pursue the "story," Plaintiffs aver they were provided an official assignment, per standard operating procedures, to travel to the Property by an unknown assignment editor at the *Journal*.

31.     At the time of the criminal trespass by Defendant Thompson and Perez, they did interview Plaintiffs' house sitter Melissa Carroll ("Carroll") who provided fallacious statements.

---

[5] The vessels are not boats but "are generally referred to as Super Yachts which are longer than 131 feet" (Wikipedia Definition). One of the yachts in the Cannes photograph is the "Sea Owl" at 203 feet with a crew of 18 and listed for sale at €104,000,000.00 in July 2021 .

32.    Paramour Carroll and her "fiancé" Brandon Clark ("Clark") were obligated by an in force signed agreement to not speak to the press, not let anyone into the Property nor disclose any confidential information.

33.    Also, at the time of the criminal trespass, Defendant Thompson photographed the interior of the property without permission of the Plaintiffs.  The images taken by Thompson revealed private information about the Plaintiffs that were subsequently published by the *Journal*.  Moreover, Thompson photographed Plaintiff Handler Jacobs' now missing USMS badge in violation of 18 U.S.C § 701[6] as the image was subsequently published and offered for sale (up to € 99.00) by the *Journal* on its agent's website (*See* Doc. 1-1, Exhibit 10).  Trespass on Plaintiffs' chattel did and continues to occur.

34.    When leaving the Property, Defendants Thompson and/or Perez took the Cannes photograph to the *Journal* photography department, which was Defendant former Photo Editor Petroski's domain.

35.    In the *Journal* photography department, either Defendants Thompson, Petroski or Does, did scan and copy the Cannes photograph, which was a 4x6 inch color print, into digital form for usage in the defamatory material and by third parties.  "Copying is one of the exclusive rights protected under the Copyright Act. *See* 17 U.S.C. § 106(1)" *BC Technical, Inc. v. Ensil International Corp.*, 464 F. App'x 689, 15 (10th Cir. 2012).

---

[6] "Whoever manufactures, sells, or possesses any badge, identification card, or other insignia, of the design prescribed by the head of any department or agency of the United States for use by any officer or employee thereof, **or any colorable imitation thereof, or photographs, prints,** or in any **other manner makes or executes any engraving, photograph, print,** or impression in the likeness of any such badge, identification card, or other insignia, or any colorable imitation thereof, except as authorized under regulations made pursuant to law, **shall be fined under this title or imprisoned not more than six months, or both**." (Emphasis added).

36.    Following the digitization of the Cannes photograph, it was provided to Defendant Moses, as Managing Editor[7], for approval and placement of the Cannes photograph on the *Journal*'s website and on the front page of the newspaper.  Unknown to Plaintiffs is if Moses was required to get the permission of Walz.  Therefore, the Cannes photograph was promulgated and seen by a number of known and unknown *Journal* employees prior to publication (See ¶ 143 hereinbelow).

37.    At that point in time, Defendants Kaplan and Perez were writing the defamatory article, combining the unverified one-source interview with information from the Department of Justice's press release. However, some of the information was "twisted" by the writers, placing Plaintiffs in false light (*See* Doc. 1-1, Exhibit 12).

38.    The Cannes photograph, having been passed through multiple hands constitutes a "conspiracy" while depriving Plaintiff Jacobs of his copyright.  Further, trespass on chattel continued to occur while the Cannes photograph lay in the hands of an unknown amount of people at the *Journal* prior to publication and continues as of this Third Amended Complaint.

### The Defendants Did Violate the Copyright Ownership of the Cannes Photograph

39.    The photo caption under the Cannes photograph in the *Journal* states the Defendants admit that the Cannes photograph "was **found** at their [Jacobs] Northeast Albuquerque home" and purposefully neither refers to the physical location where the photograph was originally created nor the date.  In other words, the image was of "unknown

---

[7]  Merriam Webster dictionary defines Managing Editor as **"**an editor in executive and supervisory charge of all editorial activities of a publication (such as a newspaper)." Furthermore, concerning duties of the managing editor, Wikipedia adds "It is their job to approve stories for print or final copy."  At *Work.chronicle.com* (aka Houston Chronicle) "The managing editor determines the importance of articles and what goes on the front page."

origin."[8]  Plaintiffs alleges that Defendants would know that the Cannes photograph was not

created in New Mexico and not their copyrighted image.  This was an **"out-of-context"**

**placement** leading to false light conclusions because the image was not connected to the Jacobs

Article nor the NY Case accusations (emphasis added). The photograph was taken when

Plaintiffs were at the 2016 Cannes Film Festival promoting their film in France.

40.     The Journal's use was undisputedly commercial in nature. The court in _Monge v._

_Maya Magazines, Inc._, 688 F.3d 1164, 1176 (9th Cir. 2012)[9] opined that "[t]he Supreme Court

has stated that "every commercial use of copyrighted material is presumptively an unfair

exploitation of the monopoly privilege that belongs to the owner of the copyright." _Sony,_ 464

U.S. at 451, 104 S.Ct. 774." "There is no dispute here that Maya is motivated by profits, and in

fact profited from the publication of the pictures." _Id._

41.     This theft and conversion, when discovered by Plaintiff Jacobs, was then reported

to the Albuquerque Police Department ("APD") and filed under Case number 19-100264 on or

about October 1, 2019 (See Doc. 37-2, Exhibit C).

42.     Plaintiffs sent a certified demand letter to Defendant Lang at the _Journal_ on or

about December 14, 2019 and received a response from its counsel, Mr. Charles R. Peifer ("Mr.

Peifer") on or about January 20, 2020.  The letter was sent prior to the three-year anniversary of

the publication (_See_ Doc. 37-2, Exhibit D).

43.     Plaintiff Jacobs is the sole owner[10] of the Cannes photograph which was created

on May 20, 2016 in Nice, France, while the couple were attendees at the Cannes Film Festival.

---

[8]  In Plaintiff's extensive experience with publications, each newspaper, magazine, and book publisher
    has a form of a Rights and Permissions department which clears a photograph for use in the publication.
[9]  This case involves a photographer who stole photographs and claimed to own the copyright.
[10]  "The United States Copyright Act discusses ownership of authored works, such as web pages. Under
    that Act, copyright ownership of a work "vests initially in the author or authors of the work." 17 U.S.C.
    § 201(a) (2000)" _State v. Kirby,_ 141 N.M. 838, 841 (N.M. 2007)

The photograph was taken using Plaintiffs' cell phone and they are in possession of the original digital file. Plaintiff Jacobs has the Cannes photograph registered with the U.S. Copyright Office # VA 2-206-246 (*See* Doc. 28-1).

**Defendants did Convert the Cannes Photograph**

44.     Aside from publishing the Cannes photograph in the Jacobs Article, Plaintiff Jacobs discovered that the image was also converted for use in foreign publications such as, but not limited to, the *Singapore Straights Times* newspaper[11] (published January 12, 2017) (*See* Doc. 1-1, Exhibit 5), a Chinese Malaysian[12] newspaper (published January 10, 2017 and first discovered May 30, 2020) (*See* Doc. 1-1, Exhibit 6), and the Sri Lanka Royal Turf Club Facebook site, all with photo credit given to the *Journal* as well as copyright claimed. (*See* caption in Doc. 1-1, Exhibit 5).

45.     Plaintiffs allege that the *Journal* received compensation for the usage of the Cannes photographs and other unauthorized photographs as the *Journal* is a for-profit company[13]. Plausibility rests with the third-party usage of the copyright symbol attributed to the *Journal,* which is a media industry standard, that the *Journal* "owns" the Cannes photograph and has the rights to sell the image.

46.     Plaintiff Jacobs has also discovered that the *Journal* contracts the services of a California photo agency[14], Zuma Press ("Zuma"), who ironically has been Plaintiff Jacobs' agent

---

[11] Singapore apparently does not have a Single Publication Rule. Copyright infringement is a criminal offense with a 6 year of Statute of Limitations.

[12] Malaysia apparently does not have a Single Publication Rule. Copyright infringement is a criminal offense with a 6 year of Statute of Limitations

[13] New Mexico Secretary of State Corporations and Business Services Business ID #1903624 for Journal Publishing Company. Entity type is listed as Domestic Profit Corporation.

[14] Photo agencies are "middlemen" in stock photography. They mediate between the photographers who own the copyright to their photos and want to license them for money and the designers and creatives who need professional photos quick and cheap. https://www.stockphotosecrets.com/questions-answers/photo-agency.html

for over 30 years, to distribute the Cannes photograph worldwide along with other unauthorized photographs taken at Plaintiffs' home. On or about August 30, 2020 Plaintiff Jacobs discovered images published on the Zuma partner Imago-Images ("Imago") website in Germany (*See* Doc. 1-1, Exhibit 7). Plaintiff Jacobs avers that the images appeared on Zuma's site as well.

47.     Plaintiff Jacobs has been informed by the Zuma's owner and therefore believes that Zuma did not supply the Cannes photograph to the *Singapore Straights Times*, the Chinese Malaysian newspaper, or the Sri Lanka Royal Turf Club Facebook site.   Plaintiffs allege that contributory liability does attach if the defendant knows of the direct infringement. *Diversey v. Schmidly*, 738 F.3d at 1204 (10th Cir. 2013) and further alleges that the *Journal* sold the Cannes photograph directly to the above. Plaintiffs allege that Defendants knew the Cannes photograph did not belong to them when Thompson and Perez stole the image from Plaintiffs' home, and that Defendants did not have the authority to publish the photograph in either the *Journal* or third party-party outlets which includes the Imago and Zuma sites.  Moreover, in the alternative, the court in *Fonovisa, Inc. v. Cherry Auction, Inc*., 76 F.3d 259 (9th Cir. 1996) states "[a] defendant may be vicariously liable even when he or she is not aware of the infringing activity."

48.     In this instant case, Plaintiffs assert the *Journal et al*, knew that the copyright did not belong to the *Journal* or Thompson and that providing the Cannes photograph to third parties amounted to an activity of vicarious infringement.

49.     Furthermore, as evidenced by the photographs offered on the Imago/Zuma website, the Cannes photograph was offered for reproduction up to € 99.00 and credited to "imago images / Zuma Press." (*See* Doc. 37-2, Exhibit E).   Therefore, as a for profit company, Plaintiffs allege

that the *Journal* would have been contacted by the third-party publications to arrange a fee agreement.

50.    The defamatory material also includes misleading and factually false information that was allegedly obtained during an interview by Defendant Perez with Carroll, the paramour of Plaintiffs' house-sitter Clark during the criminal trespass on Plaintiffs' home and chattel. As noted above, Defendant Kaplan also contributed to the Jacobs Article.

51.    Following the filing of the original Complaint, on or about September 2021, the *Journal* did remove the Cannes photograph from their website, which Plaintiffs aver, creating a re-publication (*See* Doc. 37-2,  Exhibit B)[15]. Plaintiff Jacobs contacted *Newspapers.com*, and they removed the Cannes photograph after seeking permission from the *Journal*.

52.    During another Internet search, Plaintiff Jacobs discovered, what the Plaintiffs believe to be a re-publication of the Cannes photograph, which included the beginning of the Jacobs Article with an arrow pointing viewers to the *Journal* and the remaining portion of the Jacobs Article (*See* Doc. 2-1, Exhibit 5).

53.    Plaintiffs respectfully request that the Court take Notice of all previous fillings on the Docket.

**PERTINENT FACTS**

54.    The terms "publication" or "published," for the purposes of this Complaint, refers to the original publication date as well as the continuing publication of the Cannes photograph within the defamatory material on the *Journal's* website and Facebook Page (*See* Exhibit 2) and in known and unknown global outlets either mentioned herein or to be sought through discovery.

**The Uniform Single Publication Rule's Three-Year Limitation was in Effect from the *Journal* Publication Date of December 15, 2016 until December 15, 2019**

---

[15] As of this Third Amended Complaint, the Jacobs Article has been removed from the *Journal* website.

55.     The defense of the Uniform Single Publication Act ("USPR"), which specifically states that "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort" would occur after three years after original publication. Moreover, in _Woodhull v. Meinel_, 2009-NMCA-015, ¶ 9,45 N.M. 533, it states that "the statute of limitations runs from the point at which the original dissemination occurred" i.e.; December 15, 2016 beginning with the _Journal's_ on-line publication of the Cannes photograph and the defamatory article. Plaintiffs provide herein several avenues to address this defense.

### The New Mexico Discovery Rule, and Statutes of Limitations with Relation to pre-USPR Criminal Trespass, Trespass on Chattel, and Invasion of Privacy

56.     In New Mexico, the USPR runs for a limitation period of three years without the opportunity to utilize the New Mexico Discovery Rule ("Discovery Rule").  Specifically, it states that "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort."

57.     New Mexico applies the "discovery rule," which means that the statute of limitations period "begins to run when the claimant has knowledge of sufficient facts to constitute a cause of action." _Gerke v. Romero_, 148 N.M. 367, 371, 237 P.3d 111, 115 (Ct.App.2010). The discovery rule provides that the cause of action accrues "when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists." _Williams v. Stewart_, 137 N.M. 420, 424, 112 P.3d 281, 285 (Ct.App.2005)

58.     First, the Cannes photograph is situated within three points of view: criminal trespass, theft, and the copyright issues. The U.S. Copyright Act is a strict liability statute and copyright is a strict liability tort (_See_ ¶ 80 hereinbelow). Plaintiffs argue that copyright violations do not fit into the parameters of the USPR as the rule, a legal protection that is applied in defamation cases, is critical to shielding publishers from endless liability for each instance that

15

an article or book is sold or distributed[16].   As a universal rule, images are protected by copyright laws around the world and Defendants, as well as the general public, need permission to use an image as-is or to adapt it.  Plaintiffs further argue that USPR does not relate to the pre-publication of the Cannes photograph and *Journal* article. The original Internet distribution occurred on December 15, 2016 followed by the print edition the next day. Therefore, violations by Defendants Perez and Thompson on or about December 15, 2016, when they criminally trespassed on Plaintiffs' home and chattel, are not covered by the USPR or its statute of limitations. This also holds true for the *Journal*'s photography department, Kaplan, Moses, Walz, Petroski, Lang and Does prior to 10:23am on December 15, 2016 when the *Journal* article first appeared on the Internet.  Decisions and actions made by all Defendants are chargeable prior to the distribution and bound by the Discovery Rule.

> A claim ordinarily accrues "when [a] plaintiff has a complete and present cause of action." *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S. Ct. 542, 139 L. Ed. 2d 553 (1997) (internal quotation marks omitted). In other words, the limitations period generally begins to run at the point when "the plaintiff can file suit and obtain relief." *Ibid.* A copyright claim thus arises or "accrue[s]" when an infringing act occurs.

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014).  Also see *Starz Ent., LLC v. MGM Domestic Television Distrib., LLC*, 39 F.4th 1236, 1242-44 (9th Cir. 2022) (The district and appellate courts rejected that limitation holding that § 507(b) does not prohibit the recovery of damages for infringing acts that occurred outside the three-year look-back period so long as "the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances.")

---

[16] *McCandliss v. Cox Enters., Inc.*, 265 Ga. App. 378 (Ga. Ct. App. 2004)

59.     The Appellate court in *Nealy v. Warner Chappell Music, Inc.*,  No. 21-13232, at *19 (11th Cir. Feb. 27, 2023) held that copyright infringement is not bound by a three-year limitation, and as averred by Plaintiffs herein, such as the USPR,

> The district court certified the question of whether "damages in this copyright action are limited to the three-year lookback period as calculated from the date of the filing of the Complaint pursuant to the Copyright Act and *Petrella*[17]." We answer that question in the negative and conclude that where a copyright plaintiff has a timely claim for infringement occurring more than three years before the filing of the lawsuit, the plaintiff may obtain retrospective relief for that infringement.

60.     Plaintiffs were unaware of the USPR for the original Complaint and only aware of the Discovery Rule when they sent a certified demand and takedown notice to Defendants' counsel on December 14, 2019. Opposing counsel responded on January 15, 2020 and did not comply with the demands therefore Plaintiffs aver Defendants are to be considered willful in their violations.

61.     The question of "when a cause of action accrues under a statute of limitations is a judicial determination." *Roberts v. Sw. Cmty.Health Servs*., 837 P.2d 442, 446 (N.M. 1992). Discovery, in the context of this instant case, means the point at which the aggrieved party "discovers or with reasonable diligence should have discovered that a claim exists." *Roberts* at 449; see *Salopek v. Friedman*, 308 P.3d 139, 156 (N.M. Ct. App. 2013).

62.     According to the court in *Anderson Living Trust v. Energen Res. Corp*., No. 13-CV-00909 KBM-CG, at *30 (D.N.M. Nov. 25, 2014), "[t]he statute of limitations commences when an 'injury manifests itself and is ascertainable, rather than when the wrongful or negligent act occurs.'" *Saiz v. Belen Sch. Dist*., 113 N.M. 387, 401 n. 12, 827 P.2d 102, 116 n. 12 (1992);

---

[17] *Petrella v. Metro-Goldwyn-Mayer*, 572 U.S. 671, 672 (2014)

*Long v. Weaver*, 105 N.M. 188, 191 (Ct.App.1986) ("We have recognized that under the Tort Claims Act the limitation period commences when an injury manifests itself and is ascertainable, rather than when the wrongful or negligent act occurs.").

**Due Diligence and Plaintiffs' Discovery of the Jacobs Article**

63.    The Plaintiff Jacobs discovered the Jacobs Article and infringed upon Cannes photograph on September 28, 2019.  Prior to this date the Plaintiffs were unaware of the existence of the Jacobs Article publication, they were not in contact with anyone who informed them about the publication and did not receive the *Journal*.  Due diligence was not possible as the Plaintiffs did not have Internet access while incarcerated, and Plaintiff Jacobs did not have access until in or about August 2019 after his release.  The Plaintiffs were not informed by house sitters Clark or Carroll of the of the interview or the criminal trespass.  Plaintiff Jacobs was first informed about the Jacobs Article on or about September 26, 2019 by Mr. Murray Elowitz (deceased).

64.    In *Williams* the court held that "Plaintiffs had an obligation to inquire as to facts that would indicate they had a claim if the publicity reached a level that would objectively make a reasonable person inquire as to the presence of a claim" (holding that information the plaintiff received from family, newspaper articles, doctors, and her attorney constituted sufficient information to put a reasonable person on notice and imposed a duty on the plaintiff to timely file a claim).  In this instant case Plaintiffs did not have family or doctors in Albuquerque nor did they receive any newspaper articles. Plaintiffs' attorneys were based in New York and did not provide any information about a *Journal* article or any other publicity surrounding that case.

65.    Evidence addressing other facts which would allow a factfinder to determine the level of awareness the publicity would generate to a reasonable person in Plaintiffs'

communities, "[w]ithout this type of information, we believe that a reasonable inference could be reached that the publicity did not generate a duty to inquire on the part of a reasonable diligent person in Plaintiffs' situation in Plaintiffs' communities." *Id.* The Plaintiffs' new "community" was Federal prisons approximately 2000 miles from Albuquerque. It is therefore highly plausible that Plaintiffs had neither access nor knowledge of the Jacobs Article until they returned to New Mexico.

**Defendants Perez and Thompson Did Trespass on Plaintiffs' Property and Chattel**

66. In this instant case, Plaintiffs were completely unaware of the fact that employees of the Defendant *Journal* had criminally trespassed upon their home, published Plaintiffs' stolen Cannes photograph for the defamatory article until discovered on or about September 28, 2019. Plaintiffs allege that Defendants Perez and Thompson did intentionally criminally trespass on their "Private Property: No Trespassing" Sign ("Sign") (*See* Doc. 1-1, Exhibit 4) and contrary to New Mexico Statute § 30-14-1(A). The Sign, which has been posted on the Property since 2011, was clearly displayed in the front yard of Plaintiff's Property and the mere entering of the Property by Defendants was a violation thereof. Furthermore, Perez and Thompson remained on the Property without the written permission of the Plaintiffs or anyone else.

67. The United States Court of Appeals for the Fourth Circuit in *Food Lion, Inc. v. Capital Cities/ABC, Inc.* 194 F.3d 505 (4th Cir. 1999) wrote that even though the publication of the story was in the public interest, the press "has no special immunity from the application of general laws." And, the Supreme Court has said in no uncertain terms that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

68.     As noted in the defamatory material, Plaintiffs alleges that Perez and Thompson would have been fully aware that the Cannes photograph did not belong to Carroll. Thompson photographed, and had images published, of the interior of Plaintiffs' residence, again without Plaintiffs' written permission or knowledge.

69.     Plaintiffs further alleges that Defendants Perez and Thompson with intent, did willfully criminally trespass on Plaintiffs' chattel[18] including but not limited to the Cannes photograph, Plaintiff Jacobs' business whiteboard (*See* Doc. 1-1, Exhibit 1, p. 2) and Plaintiff Handler Jacobs' USMS badge (*See* Doc. 1-1, Exhibit 7 #2). These Defendants did interfere with the chattel and Plaintiffs aver that they had knowledge that a disturbance would occur.

70.     Moreover, Carroll had specific instructions, as outlined in the signed house-sitter agreement with Clark, that she did not have authorization to allow anyone into the Plaintiffs' home and was specifically prohibited from doing so. Standard protocol and instructions and for house-sitters includes the duty to protect Plaintiffs' possessions.

71.     In the alternate, Plaintiff further alleges a Private Nuisance violation. In *State ex Rel. Baxter v. Egolf*, 107 N.M. 315, 317 (N.M. Ct. App. 1988) the court opines: "A private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821D (1979). The elements of proof depend on whether the conduct is intentional or unintentional. Liability for intentional conduct requires that the conduct be unreasonable. *Padilla v. Lawrence*, 101 N.M. 556, 685 P.2d 964 (Ct.App. 1984).

72.     Defendants Perez and Thompson did intentionally invade "another's interest in the private use and enjoyment of land" when they unreasonably entered Plaintiffs' home, acted as if

---

[18] "Trespass to chattel is the intentional use or interference with a chattel which is in the possession of another, without justification" *Mestas v. CHW Grp*. , No. 19-CV-792 MV/CG, at *28 (D.N.M. Dec. 16, 2020)

they had a "search warrant" while walking around the private areas of the home, unreasonably stole the Cannes photograph and possibly other items, and unlawfully photographed Plaintiffs' chattel. Plaintiff Handler Jacobs' USMS badge was in a top dresser drawer in Plaintiffs' master bedroom and Plaintiffs aver that the only possible way to find the badge was to rummage through the dresser.

73.     Due diligence was not possible before this time as the Plaintiffs had been incarcerated and Internet was not available. Moreover, Plaintiffs did not discover the usage of the Cannes photograph in one third-party foreign publication until May 30, 2020 (*See* Doc 1-1, Exh. 6), and on the photographic agency's Imago Images' German website (*See* Doc. 1-1, Exhibit 7) until August 30, 2020. Plaintiff discovered claimed republication on or about June 22, 2020 (*See* Doc. 2-1, Exhibit 5) and in or about October 2021 *(See* Doc 37-2, Exhibit B). Moreover, prior to the USPR coming into effect, Defendants Thompson and/or Perez criminally trespassed upon Plaintiffs' property, i.e., the photographic print (which is still being held by the *Journal* despite a demand to return it to Plaintiff), Plaintiff Handler Jacobs' USMS badge, and documents in Plaintiff Jacobs' office. Defendants did initially violate the Copyright Act by scanning the Cannes photographic print before the time of original publication. Therefore, Plaintiffs allege that Defendants did criminally trespass on the Property.

**Defendants Perez and Thompson did Invade Plaintiffs' Privacy Without Consent**

74.     Plaintiffs Thompson invaded their privacy at Plaintiffs' home. "New allege that in the course of the unsanctioned entering of Plaintiffs' home and their chattel, Perez and Mexico recognizes the tort of invasion of the right of privacy. *See, e.g.*, *McNutt v. New Mexico State Trib. Co.*, 1975-NMCA-085, ¶ 8, 88 N.M. 162, 165, 538 P.2d 804, 807." *Angel Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, 1:21-cv-00978-KWR-JFR, at *15 (D.N.M. Mar. 17, 2022).

Further "New Mexico recognizes the tort of invasion of privacy and its four categories: false light, intrusion, publication of private facts, and appropriation. *Andrews v. Stallings,* 119 N.M. 478, 892 P.2d 611, 625 (App. 1995)" *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1217 (10th Cir. 2007). Restatement (Second) of Torts § 652A (1977).

75.    If an individual shares details of a person's private life without their permission to do so, they would be in violation of the invasion of privacy law. New Mexico courts would apply the Discovery Rule to Plaintiffs' invasion of privacy claim when that claim is based on the unsanctioned entering of a home rather than unsanctioned publication of a private fact (*Jacobs v. The Journal Publ'g Co.*, 1:21-cv-00690-MV-SCY (D.N.M. May 17, 2022), p. 9). The *Journal* does not have the right to publish details of a person's private life if the sharing of those facts can be considered to be intrusive or offensive by a reasonable individual.  Plaintiffs further allege that the sharing of these facts, placed the Plaintiff in a false light in the public eye.  It is important to note that whether or not the individual who disclosed the information had something to gain from the disclosure, is not relevant.

**Plaintiffs are Subject to False Light Defamation**

76.    The false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation. *See Time, Inc. v. Hill,* 385 U.S. 374, 384 n. 9, 87 S.Ct. 534, 540 n. 9, 17 L.Ed.2d 456 (1967).  *Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir. 1983)

77.    New Mexico also has laws related to the false light invasion of privacy. If an individual in New Mexico has been given publicity that casts him or her in a false light, and if the information is disclosed without his or her consent, then the individual may have a cause for

action against the person who disclosed the information, even if there is no proof that any sort of defamation occurred. To claim that a false light invasion of privacy occurred, it must be established that the defendant shared details of the plaintiff that put him or her in a false light and that the false light would be considered offensive to a reasonable individual. *Restatement (Second) of Torts* § 652E(a).

78.    In publishing the Cannes photograph, this image was placed in an unrelated Jacobs Article plausibly causing a viewer to believe that Plaintiffs purchased a yacht with money they allegedly had stolen[19]. As cited in *Moore v. Sun Pub. Corp.*, 118 N.M. 375, 384 (N.M. Ct. App. 1994), the *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 543 A.2d 1181, 1189 (Ct.) opined that a "false light claim may be established where true information published if the information tends to imply falsehoods." Plaintiffs aver this would hold for disclosure.

## Copyright Infringement Admitted by Defendants

79.    According to the U.S. Copyright office, a "valid copyright" is for an image [as in this instant case] "is under copyright protection the moment it is created and fixed in a tangible form that it is perceptible either directly or with the aid of a machine or device."[20]

80.    "In order to prove copyright infringement, a plaintiff must establish that it owns a valid copyright, and the defendant engaged in unauthorized copying of the work protected by the copyright. *See Nelson-Salabes, Inc. v. Morningside Dev*., *LLC*, 284 F.3d 505, 513 (4th Cir. 2002)" *Sinclair Broad. Grp., Inc. v. Colour Basis, LLC*, Civil No. CCB-14-2614, at *8 (D. Md. June 29, 2016).  The U.S. Copyright Office also states "[a]s a general matter, copyright infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly

---

[19] All case financial charges against Plaintiffs were dropped by the prosecutors in the NY Case.
[20] https://www.copyright.gov/help/faq/faq-general.html#:~:text=Your%20work%20is%20under%20copyright,of%20a%20machine%20or%20device.

displayed, or made into a derivative work without the permission of the copyright owner."

Moreover, copyright infringement, according to most judges[21] and scholars, is today a strict

liability tort.

81.     As seen in the caption of the "found"[22] Cannes photograph (*See* Doc 1-1, Exhibit 1)

Defendants admit by deed that Perez and Thompson stole an original photographic paper print

from Plaintiffs' home on or about December 15, 2016.  This action by both Defendants was

outside of their duties as employees of the *Journal*.  Rather than using Plaintiffs' available Motor

Vehicle Department photographs, which are in the public domain and would be lawful and

appropriate by way of identifying Plaintiffs, to illustrate the Jacobs Article, Defendants chose to

seize a photograph that would have a copyright owner other than the *Journal* and create

sensationalism in print.  Moreover, Defendants have not denied that the copyright belongs to

Plaintiff Jacobs.

82.     As an aside, with the publication of the Cannes photograph and denying the

Plaintiffs' the right of first publication in their upcoming book, Defendants have falsely

---

[21] *See e.g. Shapiro, Bernstein & Co. v. H. L. Green Co*., *supra* note 19; *Religious Technology Center v. Netcom On-Line Communication Services*, 907 F.Supp. 1361, 1370 (N.D.Cal. 1995) ("[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation"); *Educational Testing Service v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999) (copyright infringement "is a strict liability tort"); *King Records, Inc. v. Bennett*, 438 F.Supp 2d 812 (M.D.Tenn.2006); ("a general claim for copyright infringement is fundamentally one founded on strict liability."); *Gener-Villar v Adcom Group, Inc*, 509 F. Supp 2d 177, 124 (D.P.R.2007) ("the Copyright Act is a strict liability regime under which any infringer, whether innocent or intentional, is liable."); *Faulkner v. National Geographic Soc.*, 576 F.Supp.2d 609, 613 (S.D.N.Y., 2008) ("Copyright infringement is a strict liability wrong in the sense that a plaintiff need not prove wrongful intent or culpability in order to prevail"); *Jacobs v. Memphis Convention and Visitors Bureau*, 710 F.Supp.2d 663, 678 (W.D.Tenn.,2010) ("Copyright infringement, however, is at its core a strict liability cause of action, and copyright law imposes liability even in the absence of an intent to infringe the rights of the copyright holder.")

[22] *Found Property* means any property of value other than real property or fixtures thereon, which is abandoned, lost, or left unattended in a public place including, without limitation, a street, alley, or parking lot. (lawinsider.com)

connected the Cannes photograph with an alleged criminal activity. Therefore, Plaintiffs cannot use the photograph in that future publication.

83.    Furthermore, by removing the Cannes photograph from the Jacobs Article on the *Journal* website and also from *www.newspapers.com*[23] thus allowing the original complaint's copyright claim to move forward, Defendants have not denied that the copyright did belong to them and therefore voluntarily extracted the image as is required per the Digital Millennium Copyright Act of 1988[24]("DCMA").

### Defendants Violated the Digital Millennium Copyright Act of 1988

84.    Plaintiffs allege that Defendants have violated the DMCA, 17 U.S.C. § 1202. Section 1202(a) of the DMCA prohibits a person from "knowingly and with the intent to induce, enable, facilitate, or conceal infringement . . . distribut[ing] or import[ing] for distribution copyright management information that is false." 17 U.S.C. § 1202(a)(2).

85.    The court in *Millennium Funding, Inc. v. Private Internet Access, Inc.*, Civil Action 21-cv-01261-NYW-SKC, at *40 (D. Colo. Oct. 13, 2022) held that "[t]o state a claim for direct liability under § 1202(a)(2), a plaintiff must allege (1) the distribution of false CMI; (2) the defendant knew the CMI was false; and (3) the defendant acted with the intent to induce, enable, facilitate, or conceal infringement. *Penske Media Corp. v. Shutterstock, Inc.*, 548 F.Supp.3d 370, 381 (S.D.N.Y. 2021)".

#### *Vicarious Liability Under § 1202*

86.    A number of courts have analyzed whether the vicarious-liability principles applicable in the direct copyright infringement context equally apply to alleged violations of § 1202." *Millennium Funding, Inc. v. Private Internet Access, Inc.*, Civil Action 21-cv-01261-

---

[23] After Plaintiffs' request to newspapers.com/
[24] Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998)

NYW-SKC, at *37 (D. Colo. Oct. 13, 2022). The Sixth Circuit concluded that they do. *See Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 925 (6th Cir. 2003) (concluding that it would be "inappropriate to permit summary judgment . . . based on the defendants' lack of actual knowledge of the removal of the copyright management information when they may be vicariously liable for its removal."). Under *Gordon*[25], a defendant may be vicariously liable for § 1202 violations where (1) the defendant "has the right and ability to supervise the infringing conduct" and (2) the defendant "has an obvious and direct financial interest in the infringement." In this instant case, the *Journal* et al satisfies both (1) and (2) above with regard to foreign publications, photo agencies and the publication of the Cannes photograph in *myheritage.com*.

### The Takedown Notice and Plaintiff Sought Settlement with Defendant *Journal*

87.     Plaintiffs forwarded a certified letter of intent to file a lawsuit, to the *Journal*'s publisher (Defendant Lang), demanding that the publication cease the usage of Plaintiff Jacobs' copyright Cannes photograph and other defamatory material. Moreover, this action constituted a "take down notice" pursuant to Title II of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 (2000). The *Journal*'s counsel, Mr. Peifer, of Peifer, Hanson, Mullins & Baker, P.A., stated that the *Journal* declines Plaintiffs' settlement offer in his reply dated January 15, 2020 (*See* Exhibit 3).

---

[25] A small number of courts, including a court in the District of Colorado, have relied on *Gordon* in finding the same. *See, e.g.*, *Atlanta Photography, LLC v. Ian Marshall Realty, Inc.*, No. 1:13-cv-2330-AT, 2014 WL 11955391, at *4 (N.D.Ga. Mar. 7, 2014); *Rosenthal v. MPC Computers, LLC*, 493 F.Supp.2d 182, 190 (D. Mass. 2007); *Stockart.com, LLC v. Engle*, No. 10-cv-00588-MSK-MEH, 2011 WL 10894610, at *9 (D. Colo. Feb. 18, 2011), *report and recommendation adopted*, [ECF No. 63]. *Millennium Funding, Inc.*, at *37.

88.     Therefore, Plaintiffs assert that the continuing *ex facto* publication of the Cannes photograph after the settlement offer is unlawful, willful, and unconscionable.

89.     Plaintiff Jacobs did not have to register his work before sending a DMCA takedown request. Content in tangible form became his intellectual property as soon as it's created, and Plaintiff Jacobs holds the copyright and thus can send a DMCA notice. Plaintiffs sent a notice to the attorney listed for Mr. Lang and the *Journal* on December 14, 2019 without a counter-notification stating that there was no copyright infringement.  If, upon receiving a proper notification, the service provider promptly removes or blocks access to the material identified in the notification, the provider is exempt from monetary liability (Section 512(g)(1)).

90.     However, in order to qualify for the protection against liability for taking down material, the service provider must promptly notify the subscriber that it has removed or disabled access to the material.  In this instant case, the *Journal* did not notify Plaintiffs when one Cannes photograph had been removed from the *Journal's* website.  The removal from this website[26] apparently occurred in September 2021, two months after Plaintiffs filed their Complaint (Doc. 1) and 22 months after Plaintiff's Notice was received by Mr. Peifer. Plaintiffs assert that Defendants penalties are provided for knowing material misrepresentations in either a notice or have forfeited a perceived safe harbor.

91.     Any person who knowingly materially misrepresents that material is infringing, or that it was removed or blocked through mistake or misidentification, is liable for any resulting damages (including costs and attorneys' fees) incurred by the alleged infringer, the copyright owner or its licensee, or the service provider (§ 512(f)).  Prior registration of the copyrighted work - required to obtain attorney's fees and statutory damages in typical copyright cases - is not

---

[26] The Cannes photograph has not been removed from, but not limited to, the *Journal's* Facebook page and *Pressreader.com*.  Thus, the *Journal* continues to infringe on the Cannes photograph copyright.

required for cases brought under the DMCA[27]. The court in *Diamondback Indus. v. Repeat Precision, LLC*, No. 4:18-CV-902-A, at *5 (N.D. Tex. Nov. 7, 2019) continues, "First, a plain reading of the DMCA does not establish that it is subject to the registration requirement found in 17 U.S.C. § 411(a). Such requirement pertains to "civil action[s] for infringement of the copyright." 17 U.S.C. § 411(a)."

> Although a DMCA claim requires the defendant to know of potential infringement, such requirement does not necessitate registration because infringement can occur absent registration. A copyright owner's exclusive rights vest at the time of the creation of the work, and infringement occurs any time those rights are violated, even if registration has not occurred. 17 U.S.C. §§ 102, 106, 501(a); *Fourth Estate*, 139 S. Ct. at 891 (stating the "the Copyright Act safeguards copyright owners, irrespective of registration, by vesting them with exclusive rights upon creation of their works and prohibiting infringement from that point forward" and noting that infringement may occur "before a copyright owner applies for registration"). Registration "is not a condition of copyright protection." 17 U.S.C. § 408(a). Therefore, although the DMCA mentions infringement, the plain text does not require registration.

*Diamondback Indus.* *5-6.

### *Permissions and Clearance*

92.    Each publication has a permissions/clearance department whose duty is to seek permission of a copyrighted image or text which will be seen in print or on the internet.

93.    According to Georgetown University's Library[28] "Using Images in Publications" under "Permissions,"

> The right to publish a copyrighted image is controlled by the copyright owner, so **each copyrighted image that you use must have permission** or fall within an exception to the general copyright statue, such as public domain, fair use, or open access. We recommend that you begin the permissions process early to avoid any last-minute complications that may delay publication of your work. (Emphasis added)

### **Copyright Management Information Infringement**

---

[27] "*Strategic Considerations In U.S. Copyright Litigation*" This article was edited and reviewed by FindLaw Attorney Writers | Last reviewed June 13, 2017.
[28] www.library.georgetown.edu/copyright/images-publications

94.     Defendants and Does are in violation of Section 1202(a)[29] of the DCMA in that they stole a non-digital paper print, scanned the print, created a digital image, and then placed their own Copyright Management Information ("CMI") to facilitate or conceal its infringement. (*See* Doc. 1-1, Exhibit 8 and Exhibit 9).

95.     Plaintiffs allege that Defendants both knew that the CMI was false and provided or distributed the false CMI with the intent to induce, enable, facilitate, or conceal infringement. Plaintiffs have provided exhibits that clearly illustrate that false copyright and creator information were digitally placed on the stolen Cannes photograph online.  This was only possible after the Cannes photographed was scanned at the *Journal* prior to publication. Plaintiffs allege that Defendants were fully aware that the Cannes photograph did not belong to the *Journal*. Moreover, by placing the "*Copyright © 2016 Albuquerque Journal*" directly under the in-print and on-line Cannes photograph, readers would believe that the image was owned by the *Journal*[30].

96.     Online CMI is managed by the International Press Telecommunications Council ("IPTC") Photo Metadata.  The data does not show Plaintiff Jacobs as either the creator or owner of the image. From IPTC's website it states that "Photo metadata is key to protecting images' copyright and licensing information online.

97.     "Image Credits" as "Creator: Albuquerque Journal" and "Copyright: Albuquerque Journal." Doc 1-1, Exhibit 9 shows "Creator: Jim Thompson." This copyright information, which is false, falls under § 1202(c) which states "As used in this section, the term "copyright

---

[29] Subsection (a) prohibits the knowing provision or distribution of false CMI, if done with the intent to induce, enable, facilitate, or conceal infringement.

[30] Copyright management information includes this type of copyright message. See *Advanta-Star Auto. Rsch. Corp. of Am. v. Reynolds Ford, Inc*., Case No. CIV-19-912-G, 2020 WL 5823537, at *3-4 (W.D. Okla. Sept. 30, 2020)

management information" means any of the following information at (2) stating "[t]he name of, and other identifying information about, the author of a work.

98.    It is also essential for managing digital assets. Moreover, as the information is either manually entered or through the IPTC software, the *Journal* was the only party who had that opportunity. Therefore, Plaintiffs assert these entries were deliberate.

99.    Title 17, Chapter 12 Copyright Law of the United States provides that any person injured by a violation of §§ 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation (17 U.S.C. § 1202(a)). In addition, it is a criminal offense to violate §§ 1201 or 1202 willfully and for purposes of commercial advantage or private financial gain. Under §1204 penalties range up to a $500,000 fine or up to five years imprisonment for a first offense, and up to a $1,000,000 fine or up to 10 years imprisonment for subsequent offenses (DMCA).

100.    The defamatory material contains the unauthorized Cannes photograph, as credited to Thompson, of Plaintiff Jacobs' private office whiteboard, in a non-common area. Moreover, publishing the writings on the whiteboard is not only an invasion of privacy, but did lead to unfounded speculation. This photograph also appeared in the March 23, 2017 *Sri Lanka Express* (discovered on May 23, 2020) (See Doc. 1-1, Exhibit 11) wherein it has a false conclusionary caption which unduly damaged Plaintiff Jacobs' reputation abroad.  The defamatory material also contains a Thompson credited photograph of Carroll in Plaintiff Jacobs' private office holding his personal documents as she was coerced en totale[31], the Plaintiffs aver, by Perez and Thompson.  These documents did not have any correlation to the accusations filed.  Moreover,

---

[31] As Plaintiffs' house sitter, Plaintiffs assert that Defendants Thompson and Perez did goad Carroll into breaching her duty to protect Plaintiffs' Property, chattel, and confidentiality. Additionally, these defendants caused Carroll to disparage Plaintiffs while shaping her belief that her maligning Plaintiffs was acceptable.

Carroll did not have a right to enter Plaintiff Jacobs' private office and neither did the Defendants Perez and Thompson. The office had a "Private" sign posted on the door (*See* Exhibit 4).

101.  Moreover, in publishing the defamatory material, Plaintiffs allege Defendants exhibited intentional malice toward Plaintiffs when the *Journal* omitted the appropriate disclaimers, as stated to wit in the Southern District of New York press release:  Footnote 1 on the first page and the last paragraph. (*See* Doc. 1-1, Exhibit 12):

102.  Plaintiffs therefore allege that it is a pattern of practice by the *Journal* in that they did not include the disclaimer from the Plaintiffs' dismissed New Mexico Attorney General ("NMAGO") case ("NM Case") press release in their 2012 article about Plaintiffs.

103.  The Discovery Rule regarding defamation and the USPR has been addressed in *Phillips v. World Publ'g Co.*, 822 F. Supp. 2d 1114, 1122 (W.D. Wash. 2011) wherein "[t]he court addressed the rule specifically in the context of defamation cases, noting that the discovery rule applies "in matters where the publication is likely to be concealed from the plaintiff or published in a secretive manner making it unlikely to come to the injured party's attention."" In this Complaint, Plaintiffs aver the publication of the Jacobs Article was plausibly concealed for the reason enumerated in ¶¶ 63-65 hereinabove.

**Damages are Statutory or Actual or Potentially Both**

104.  In this instant case, Plaintiff Jacobs was unable to timely register copyright for the Cannes photograph and did so subsequently.  The court in *Silberman v. Innovation Luggage, Inc.*, 2003 WL 1787123 at *9-10 (S.D.N.Y. April 3, 2003), held "statutory damages under 17 U.S.C. § 504(c) were barred because the infringement commenced before the work was

registered, so the plaintiff was relegated to actual damages plus profits under 17 U.S.C. § 504(b)." *Blanch v. Koons*, 329 F. Supp. 2d 56 8, 569 (S.D.N.Y. 2004).

105.   The Copyright Act affords two alternative remedies for copyright owners.[32] Plaintiffs  may choose to recover actual damages as well as any profits attributable to the infringement that were not taken into account in computing the actual damages.[33] Alternatively, the owner may elect damages that fall within a range provided by the statute.[34] The statute limits damages based on the number of works infringed and the culpability of the infringer.  Section 503(c) of the Copyright Act states:

> "[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally..."

106.   Regarding actual damages and irreparable harm, "[B]oth the Second Circuit and this District have held that losses that are difficult to quantify constitute irreparable harm. *See Gerard et al. v. Almouli, et al.*, 746 F.2d 936, 939 (2nd Cir. 1984) ("The likelihood of irreparable harm was demonstrated since appellees' damages may not be quantified."); *Alcatel Space, S.A. v. Loral Space v. Communications Ltd.*, 154 F. Supp.2d 570, 584 (S.D.N.Y. 2001); *Muse, Inc. v. Digital-On-Demand, Inc.*, 123 F. Supp.2d 118, 132 (S.D.N.Y. 2000).  *TVT Records v. Island Def Jam Music Group*, 225 F. Supp. 2d 398, 404 (S.D.N.Y. 2002).

107.   The court in *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) held "[t]o prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions

---

[32] 17 U.S.C. § 504(a).
[33] *Id*. § 504(a)(1).
[34] *Id*. § 504(c).

were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." (quoting *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 944 (9th Cir. 2011)). *See also* *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019) ("Negligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a finding of willfulness.) Apparently, a finding of willfulness can also be made in connection with an assessment of a defendant's profits, even though reference to willful infringement is made only in connection with statutory damages. *See, e.g.*, *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 487-88 (9th Cir. 2000) (noting, in case involving allocation of defendant's profits under 17 U.S.C.§ 504(b), that "non-willful infringers" were entitled to deduct from damage assessment income taxes and management fees actually paid).

### *Copyright Punitive Damages are Appropriate as a Deterrence*

108. *4 NIMMER ON COPYRIGHT* § 14.02[C][2][35], at 14-32 cites several cases in which federal courts have considered the availability of punitive damages in copyright infringement actions, including *Bell v. Pro Arts, Inc.*, 366 F. Supp. 474, 485 (N.D. Ohio 1973). *Id.* at 14-32 through 14-33 n. 176. In *Bell,* the court determined that "[u]nder appropriate circumstances, punitive or exemplary damages may be awarded in copyright actions." *Id.* at 485 (citation omitted). Nevertheless, the trial court did not award punitive damages because it concluded that the circumstances of the case did not "necessitate" or "require" an award of punitive damages. *Id.* On appeal, the Sixth Circuit affirmed the lower court's decision, but it did not address the propriety of punitive damages presumably because the district court did not assess

---

[35] See also *NIMMER ON COPYRIGHT* § 14.02[C][2] (2007) ("The cases are clear that exemplary or **punitive damages should not be awarded in a statutory copyright infringement action**."). *Viacom Intern. Inc. v. YouTube, Inc.*, 540 F. Supp. 2d 461, 463 (S.D.N.Y. 2008). (Emphasis added)

that remedy. _Bell v. Pro Arts, Inc._,511 F.2d 451 (6th Cir. 1975). It is essential to note, however, that _Bell_ preceded the enactment of the Copyright Act of 1976, and thus, the district court did not expound upon the suitability of a punitive damages award under the Copyright Act of 1976.

109.  The court in _TVT Records v. Island Def Jam Music Group_, 262 F. Supp. 2d 185 (S.D.N.Y. 2003)[36] argued that punitive damages may be available to a plaintiff who sues for copyright infringement when there is evidence of the requisite malice, where the plaintiff would be excluded from receiving statutory damages, or where damages plus profits are an available alternative to statutory damage (_See TVT_, at 187).  Plaintiffs also cite  _Bonner v. Dawson_, No. 5:02CV00065, 2003 U.S. Dist. LEXIS 19069, at *24 (W.D. Va. Oct. 14, 2003), for the proposition that "punitive damages may be awarded upon a showing of reckless or conscious disregard for the rights of other (quoting _Bonner_, 2003 U.S. Dist. LEXIS 19069, at *24). Further, [TVT] Judge Marrero analyzed the history of punitive damage and their purpose  and found that punitive damages serve to not only punish the individual, but also to discourage "other persons from engaging in similar wrongful conduct. Id. at 423 (citing _State Farm Mut. Auto. Ins. Co. v. Campbell_, 583 U.S. 408, 415 (2003)).

---

[36] In _TVT_ 263 F. Supp,2d at 185, 187, Judge Marrero, relying in part on Silberman [_Silberman v. Innovation Luggage, Inc._, 2003 WL 1787123 at *9-10 (S.D.N.Y. April 3, 2003)," _Blanch v. Koons_, 329 F. Supp. 2d 568, 569 (S.D.N.Y. 2004), held that punitive damages were not foreclosed by the Copyright Act as a matter of law, and allowed claims for punitive damages for willful infringement to go to the jury. He held "the logical circumstances in which such damages would be available, provided the requisite malice is indicated, is in cases such as this one where the available damages exclude statutory damages, or where actual damages plus profits are available as an alternative to statutory damages." He stated that "where the contemplated award is actual damages plus profits, such a recovery is compensatory only and does not address **the interests of deterrence and punishment** that are reflected in the principles underlying both punitive damages and statutory damages for willful infringement. _Blanch v. Koons_, 329 F. Supp. 2d 568, 569 (S.D.N.Y. 2004) (Emphasis added).

110. "In light of the Court's instructions on willfulness and on copyright licensing, the Court concludes that a sufficient finding of misfeasance approaching "wanton, willful or malicious" conduct has been established with regard to the activities underlying TVT's state law claims." *TVT Records TVT Music v. Island Def Jam Music Gr*, 02 Civ. 6644, at *1 (S.D.N.Y. Apr. 23, 2003). As recognition of the law enforcement incentive that is embodied in punitive damages awards, the court and jury looked to "[d]efendants' misconduct and its deterrence in the future." *TVT Records TVT Music v. Island Def Jam Music Gr*, 02 Civ. 6644 (VM), at *9 (S.D.N.Y. Oct. 22, 2003). Plaintiffs respectfully requests that it Defendants be assessed a deterrent for the violations of the Copyright Act and their willful behavior.

111. In this instant case, Defendants have not denied that the *Journal* violated Plaintiffs copyright on the Cannes photograph, nor have they denied the criminal trespass and wanton theft of the photograph. In a civilized community, theft and criminal trespass for the want of a story is unconscionable. Copyright infringement in this instant case was and is willful as evidenced by the *Journa*l not immediately removing the Cannes photograph when confronted (See ¶ XX above). Moreover, the *Journal's* Facebook page willfully continues to use the Cannes photograph without authority – the *Journal* has control over its own Facebook page (See Exhibit 2).

## FIRST CAUSE OF ACTION
### Copyright Infringement *Per Se*

112. Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against the *Journal*, Lang, Thompson, Petroski, Hanson, Moses, Walz and Does.

113. Plaintiffs allege copyright infringement under the Copyright Act, 17 U.S.C. § 101, et seq.

114.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages he has suffered, as well as punitive damages, and cost of suit.  Plaintiffs seek actual damages under 17 U.S.C. § 504(b) (per § 504(a)(1) and § 504(d). If the defendant's infringement was adjudged willful, the district court may also award, in compensation of the direct and consequential economic and non-economic damages Plaintiffs have suffered, as well as punitive damages, cost of suit and non-copyright attorney fees, if any.

**SECOND CAUSE OF ACTION**
**Contributory Copyright Infringement**

115.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against Defendants *Journal,* Lang, Thompson, Hanson, Petroski, Walz, Moses and Does.

116.  Plaintiffs allege contributory copyright infringement under the Copyright Act, 17 U.S.C. § 501 et seq.  Plaintiffs allege that the infringements were known by Defendants and made in disregard of the Cannes photograph original copyright.  Further, Plaintiffs asserts that Defendants sold the Cannes photograph to the third-party publishers which unlawfully published the Cannes photograph. Moreover, Plaintiffs allege the that the *Journal* contractually provided the Cannes photograph to Zuma, for sale, resulting in the image being at least published on both the Zuma and Imago websites in violation of Plaintiff Jacobs' copyright.

117.  Moreover, as Defendants did not purge the *Journal*'s system of the Cannes photograph after being informed of the violation, therefore Defendants are also liable for contributory infringement,

> The  court further pointed to the ability of Napster to remove copyrighted material once it was made aware of its existence. This was consistent with the court's ruling in *Religious Tech. Ctr. v. Netcom On-Line Communication Servs*. that held a computer system

operator who learns of specific infringing material available on his system and fails to purge such material from the system would be liable for contributory infringement.

*Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc*., 907 F. Supp. 1361, 1374 [N.D. Cal. 1995].

118.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for violation of contributory infringement, in compensation of the direct and consequential economic and non-economic damages Plaintiffs have suffered, as well as punitive damages, cost of suit and non-copyright attorney fees, if any.

### THIRD CAUSE OF ACTION
### Copyright Management Infringement and the DMCA

119.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against Defendants *Journal,* Lang, Thompson, Hanson, Petroski, Walz, Moses and Does.

120.  With the expansion of the Act, and the 1998 enactment of the DMCA expanded existing copyright laws to include and address issues associated with the internet and digital media, Plaintiffs allege that Defendants did violate the DCMA at § 1202.

121.  Plaintiffs allege copyright management infringement under the Copyright Act, 17 U.S.C. § 1202(a) of the DMCA which makes it unlawful to provide or distribute false CMI with the intent to induce or conceal infringement (*See* Doc. 1-1, Exhibits 8 and 9).

122.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for Copyright Management Infringement, in compensation of the direct and consequential economic and non-economic damages he has suffered, as well as actual damages, punitive damages, cost of suit and copyright non-statutory attorney fees, if any.

### FOURTH CAUSE OF ACTION
### Intentional Tort of Trespass *Per Se*

123.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against Defendants Perez and Thompson.

124.  Plaintiffs allege that Defendants Perez and Thompson did knowingly and willfully criminally trespass upon Plaintiffs' "Private Property: No Trespassing" posted Property on or about December 15, 2016, without any written permission in violation of NM Statute § 30-14-1(A) and as a direct and intentional act.

125.  The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and does justify the awarding of exemplary and punitive damages in the amount of no less than $1,000,000.00.

126.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for criminally trespassing on Plaintiffs' real Property, in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and attorney fees, if any.

### FIFTH CAUSE OF ACTION
**Intentional Tort of Trespass of Chattel *Per Se***

127.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against Defendants *Journal*, Lang, Perez, Thompson, Petroski, Moses, Walz and Does

128.  Plaintiffs allege that on or about December 15, 2016, the Defendants trespassed upon Plaintiffs chattel as evidence by the Cannes photograph caption stating that the [framed] photograph was "found" in Plaintiffs' home.  Plaintiffs aver that Defendants removed an unknown amount of Plaintiffs' chattel from the Property possibly including the missing USMS badge (*See* Doc. 1-1, Exhibit 10) and other items.  Defendants continually deprived Plaintiff Jacobs of possession or control of the Cannes photograph, the USMS badge, and the other items.

Plaintiffs are informed and therefore believes that Defendant *Journal* and all Defendants are currently in possession of the chattel.

129.  The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and does justify the awarding of exemplary and punitive damages in the amount of no less than $1,000,000.00.

130.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for trespassing on Plaintiffs' chattel, in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and attorney fees, if any.

**SIXTH CAUSE OF ACTION**
**Intentional Tort of Conversion *Per Se***

131.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against Defendants *Journal*, Lang, Thompson, Petroski, Hanson, Moses, Walz and Does.

132.  Plaintiffs allege that on or about December 15, 2016, the *Journal* first published Plaintiff Jacobs' personal property, i.e., the copyrighted Cannes photograph, that it was unlawfully acquired by Defendants Perez and Thompson while criminally trespassing on Plaintiffs' home and chattel.  Plaintiffs also aver this is *prima-facie* admission of guilt when Defendants wrote in the Jacobs article that they "found" the photograph in Plaintiff and Spouse's home and when Defendant's counsel refused to return the Cannes photograph.  At all times mentioned herein, Plaintiffs are entitled to the possession of their personal property.

133.  The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and does justify the awarding of exemplary, compensatory and punitive damages in the amount of no less than $1,000,000.00.

134.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and attorney fees.

## SEVENTH CAUSE OF ACTION
### Invasion of Privacy Tort: Intrusion Upon Seclusion

135.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against Defendants Thompson and Perez.

136.  Plaintiffs allege that Defendants violated their seclusion pre-publication when they caused the invasion of Plaintiffs' private affairs and activities as a result of physical and chattel trespass, and in a manner that is so objectively unreasonable as to offend or embarrass an ordinarily prudent person.  "Intrusion into solitude appears to be based on the manner in which a defendant obtains information, and not what a defendant later does with the information, which is covered by the public-disclosure-of-private-facts branch." *Fernandez-Wells v. Beauvais*, 127 N.M. 487, 983 P.2d 1006, 1010 (App. 1999)" *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1217 (10th Cir. 2007).

137.  In *Jacobs* (Doc. 49), the Magistrate held that "unauthorized intrusion into a person's private concerns also qualifies as intrusion upon seclusion, and Plaintiffs have alleged that Defendants interfered with their photograph, business whiteboard, and United States Marshal Service badge." And Carroll posing in Plaintiff Jacobs' private office displaying private business documents.

138.  The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and does justify the awarding of exemplary and punitive damages in the amount of no less than $1,000,000.00.

139.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against

the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and related attorney fees, if any.

## EIGHTH CAUSE OF ACTION
### Invasion of Privacy Tort: Public Disclosure of Private Facts

140.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against all Defendants.

141.  On or about December 15, 2016, Defendant Thompson photographed Plaintiff Jacobs' office whiteboard that contained private facts and thereafter caused, with the assistance of other defendants, this image to be published in the *Journal* as part of the Jacobs Article (See Doc. 1-1, Exhibit 1, p. 2) and elsewhere (Se Doc. 1-1, Exhibits 6 and 11).  Further, Thompson photographed the USMS badge with private information about Plaintiff Handler Jacobs, and it was published on the Zuma and Imago websites (*See* Doc. 1-1, Exhibit 7). Moreover, Thompson and others caused the publication of Carroll images photographed in Plaintiff Jacobs' private office with her holding documents that were pulled from files. All of these images were unrelated to the NY Case accusations.

142.  Plaintiffs allege that prior to publication, Defendants Perez and Thompson disclosed private facts[37] and information to approximately 23 members of the *Journal's* editorial staff [38] and photography department as a result of the trespass of Plaintiffs' home. The staff are members of the public while journalism is a public service.  Plaintiff Jacobs has had many decades of personal experience in publication's editorial offices and has experienced, prior to publication,

---

[37] A private fact is a detail of a person's life that is not generally known to the public or, at the very least, is not information that is publicly available. *See* www.findlaw.com/injury/torts-and-personal-injuries/invasion-of-privacy.
[38] https://www.abqjournal.com/site/personnel.html

the disclosure of stories and photographs amongst the employees. Plaintiffs further allege that the Cannes photograph and whiteboard were private and not of public record, and that the facts were not of legitimate public concern. The tort of public disclosure is defined in New Mexico as "disclosure which would be objectionable to a reasonable person, and a lack of legitimate public interest in the information." *Fernandez-Wells*, 983 P.2d at 1008 (citing Prosser Keeton § 117, at 856-57 and Restatement § 652D)" *Alvarado* at 1218.

143. The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and does justify the awarding of exemplary and punitive damages in the amount of no less than $1,000,000.00.

144. WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and attorney fees, if any.

<u>NINETH CAUSE OF ACTION</u>
**Intentional Infliction of Emotional Distress Tort**

145. Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this cause against all Defendants.

146. The Plaintiffs are senior citizens. Plaintiff Jacobs, who is a 100% service-related disabled veteran, alleges that he continues to suffer severe emotional distress because of Defendants' extreme and egregious conduct. Plaintiff Handler Jacobs is a Leukemia patient and also continues to suffer severe emotional distress which has inexcusably affected her condition. Plaintiffs further allege that Defendants' bad faith conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community with intentionally or recklessly made statements that created

a high degree of risk of harm, yet deliberately proceeded to act with conscious disregard or indifference to the risk.

147.  In support, the _Estate of Trentadue ex rel. Aguilar v. United States,_ 397 F.3d 840, 856 (10th Cir. 2005) the court held "the "recklessness" element of a claim for intentional infliction of emotional distress "includes actions that are in deliberate disregard of a high degree of probability that the emotional distress will follow" (internal quotation marks omitted)."

148.  Specifically, Defendants criminally trespassed on Plaintiffs' real property, rummaged through personal and business files, stole Plaintiffs' tangible property, entered Plaintiff Jacobs' private office which had a "Private" sign on the door (_See_ Exhibit 4), caused a contracted house sitter to violate her agreement, made misleading or false statements of fact in a regionally circulated newspaper and internationally on the Internet including the ownership of the Cannes photograph.  Expectation of privacy, Plaintiffs assert that the _Journal_ deliberately did not follow through on the Plaintiffs' story as to the outcome leaving readers unaware of the finality of both the previous NM Case and NY Case referred to hereinabove. Moreover, the _Journal_ did not publish the "presumption of innocence" disclaimers provided to them in the NY Case (_See_ Doc. 1-1, Exhibit 12). The previous 2012 New Mexico press release had a disclaimer and was published by the _Journal_ as provided by the Plaintiffs' attorney, who was available as Plaintiffs' counsel at the time of the Jacobs Article and could have been contacted.

149.  With the publication of the Cannes photograph and denying the Plaintiffs' the right of first publication in their upcoming book, Defendants have falsely connected the Cannes photograph with an alleged criminal activity. Therefore, Plaintiffs cannot use the photograph in that future publication. This has contributed to emotional distress for the Plaintiffs.

150.  Therefore, Plaintiffs have and continually suffers substantial injury as a result of

Defendants' defamatory material, including but not limited to injury to character and reputation, mental anguish, loss of past and future income and loss of earning capacity. Plaintiffs have suffered direct and irreparable severe personal and economic injury does justify the awarding of exemplary, compensatory, and punitive damages in the amount of no less than $5,000,000.00.

151. WHEREFORE. Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any non-copyright attorney fees.

## <u>CONCLUSION</u>

Plaintiffs' Summation of Allegations in the Complaint:

A. That Perez and Thompson committed criminal trespass on Plaintiffs' real property;

B. That Perez and Thompson committed, and the *Journal* thereby continues, to trespass upon Plaintiffs' chattel;

C. That Perez and Thompson did invade the Plaintiffs privacy pre-publication;

D. That Perez and Thompson did rummage through Plaintiffs' possessions to obtain the USMS badge in Plaintiffs' bedroom and documents in the private office.

E. That Thompson and/or Perez committed larceny with the theft of the Cannes photograph;

F. On December 14, 2020, Plaintiffs requested the return of the stolen print and the *Journal* ignored said demand;

G. That the *Journal's* Photo editor and other committed the first violation of the Copyright Act by scanning the Cannes photograph thereby creating a digital image pre-publication;

H. That unknown *Journal* employee(s) did take the scanned Cannes photograph, pre-publication, and placed it in a layout application for publication in the print edition and on-line editions;

I. That the *Journal* and co-Defendants did convert the Cannes photograph by scanning then selling it to third parties;

J.  That Thompson committed a violation of federal law when he photographed Plaintiff Handler Jacobs' USMS badge, and the *Journal* offered the image for sale on the Imago and Zuma websites;

K.  That the *Journal* and co-Defendants did infringe on the copyright through the DMCA of Plaintiffs' Cannes photograph when published on the *Journal* websites and *Newspapers.com*;

L.  That the *Journal* and co-Defendants did violate the U.S. Copyright Act by Contributory Copyright Infringement of the Cannes photograph to third parties;

M.  That the *Journal* and co-Defendants did violate the U.S. Copyright Act by falsifying Copyright Management Information on the Cannes photograph;

N.  That the *Journal* and co-Defendants did defame Plaintiffs and commit libel in the reckless unauthorized publication of the Cannes photograph;

O.  That the *Journal* and co-Defendants, in publishing the stolen Cannes photograph in the defamatory article did invade the privacy of Plaintiffs, including false light, intrusion, and the disclosure of private facts pre-publication;

P.  That all Defendants caused loss of enjoyment of life and are entitled to hedonic damages; and

Q.  That all Defendants committed Intentional Infliction of Emotion Distress by their actions as claimed hereinabove.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully prays for the following relief against each and every

Defendant:

A.  That the Court orders Defendants to remove the Cannes photograph from the *Journal's* Facebook page, *Pressreader.com*, and from search engines;

B.  That the Court orders Defendants to inform any and all foreign publications using the Cannes photograph, admit to the copyright violations, and request removal of the Cannes photograph from their systems, including websites.

C.  That the Court to order Defendants, purge the Cannes photograph from their systems, including Zuma Press.

D.  That the Court orders the *Journal* to purge the Cannes photograph from its digital filing system;

E.  That the Court orders the return of any of Plaintiffs' chattel in Defendants' possession;

F.  That the Court order Defendants to safeguard any and all records, financial or not, concerning the Cannes photograph and unauthorized images taken at Plaintiffs' home;

G.  That the Court, under NM Stat § 56-8-3 (2019) finds interest at the legal rate on the value of the stolen Cannes photograph from and after December 15, 2016;

H.  That the Court finds that Defendants violated 18 U.S.C § 701 and refer this violation to the proper authority;

I.  That the Court award to Plaintiffs punitive, compensatory, and special damages of not less than $10,000,000.00, to be determined at trial by jury;

J.  That the Court award to Plaintiffs all litigation costs of this action, including any court costs and appropriate non-copyright attorneys' fees, if any, and

K.  Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right to amend this Second Amended Complaint as new information becomes available to Plaintiffs.

Respectfully submitted this 28th day of July 2023.

*/s/ Michael Jacobs*
Michael Jacobs
*Plaintiff, pro se*
800 Calle Divina NE
Albuquerque, NM 87113
Tel: (505) 321-3044
michael.mjphoto@gmail.com

*/s/ Ruby Handler Jacobs*
Ruby Handler Jacobs
*Plaintiff, pro se*
