## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MICHAEL JACOBS, *et al.*,

      Plaintiffs,

v.

THE JOURNAL PUBLISHING COMPANY
*d/b/a* THE ALBUQUERQUE JOURNAL, *et al.*,

      Defendants.

Civ. No. 21-690 MV/KK

## MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

In December 2016, Plaintiffs Michael Jacobs and Ruby Handler Jacobs[2] were each charged by indictment with nine federal white-collar crimes. (Docs. 196-5, 196-6.) Defendant the *Albuquerque Journal* ("*Journal*"), a newspaper, published an article about the charges. (*See, e.g.,* Doc. 196-1.) Plaintiffs' claims in this case derive from the *Journal*'s publication of the article and accompanying photographs. (Doc. 79.)

Now before the Court is Defendants' Motion for Summary Judgment (Doc. 196) ("Defendants' Motion"), filed April 18, 2025, in which Defendants seek summary judgment on all of Plaintiffs' claims. Also before the Court are Plaintiffs': (1) Motion for Summary Judgment (Doc. 213) ("Plaintiffs' Motion"), filed June 24, 2025; (2) Amended Motion to Extend the Deadline by One Day to File Reply to Defendants' Response to Plaintiffs' Motion for Summary

---

[1] By an Order of Reference (Doc. 224) entered on July 30, 2025, Senior United States District Judge Martha Vázquez referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

[2] In these Proposed Findings and Recommended Disposition, I refer to Plaintiffs Michael Jacobs and Ruby Handler Jacobs collectively as "Plaintiffs" and individually as "Mr. Jacobs" and "Ms. Handler Jacobs."

Judgment Due to Continued Medical Emergency and Opposing Counsel's Last Minute Denial of Plaintiffs' Page Count Request (Doc. 226) ("Motion to Extend"), filed August 6, 2025; and, (3) Motion for Leave to Amend Motion for Summary Judgment (Doc. 230) ("Motion to Amend"), filed August 20, 2025. Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, I propose to find that Defendants' Motion is well-taken in part and RECOMMEND that it be GRANTED IN PART and DENIED IN PART as set forth below. I further propose to find that Plaintiffs' Motions are not well-taken and RECOMMEND that they be DENIED.

## I.    FACTS AND PROCEDURAL HISTORY

In their Motion, Defendants assert 54 "Undisputed Material Facts" ("UMFs"), supported by citations to attached exhibits. (Doc. 196 at 3-16.) Although Plaintiffs attempt to dispute many of these UMFs in their response, they fail to do so adequately. For example, Plaintiffs purport to dispute all or portions of Defendants' UMFs Nos. 1, 3, 9, 13, 16, 21, 33-34, 41, and 48 without citing any record evidence that contradicts them. (Doc. 211 at ¶¶ 21, 24, 34, 42, 49, 55, 70, 72-73, 82, 90.) In other instances, Plaintiffs purport to dispute all or portions of Defendants' UMFs Nos. 1, 10-13, 16, 28, 30, 33-34, 36, 45, 49, and 51 based on semantic quibbles that do not amount to genuine, material disputes.[3] (*Id.* at ¶¶ 21, 36, 38-40, 42, 49-50, 62-63, 67, 71, 73, 75, 86, 91, 94.) Elsewhere, Plaintiffs attempt to create factual disputes regarding Defendants' UMFs Nos. 2, 13-14, and 39 with affidavits that directly contradict their own prior deposition testimony or are not

---

[3] For example, Plaintiffs purport to dispute Defendants' statement that the "Cannes photograph" depicts Plaintiffs standing in front of two "boats," (Doc. 196 at ¶ 1), by averring that the boats are in fact "yachts." (Doc. 211 at ¶ 21 (citing Doc. 79 at 8 n.5).) In response to Defendants' statement that Melissa Carroll and Brandon Clark "received mail and deliveries at [Plaintiffs'] house," (Doc. 196 at ¶ 11), Plaintiffs assert that Ms. Carroll and Mr. Clark "had separate mailboxes" as well. (Doc. 211 at ¶ 38.) And in response to Defendants' statement that "Plaintiffs never used the Cannes photo for any purposes before or after it was published by the [*Journal*], other than to display in their home," (Doc. 196 at ¶ 34), Plaintiffs assert that "the statement and the word 'purposes' are confusing.'" (Doc. 211 at ¶ 73.)

2

based on personal knowledge. (Doc. 211 at ¶¶ 23, 43, 45-46, 80.) Finally, Plaintiffs do not dispute all or portions of Defendants' UMFs Nos. 1, 14-15, 17-20, 23, 25-26, 37-38, 45-47, 49-50, 52, and 54. (Doc. 211 at ¶¶ 20, 22, 47-48, 51-54, 57, 59-60, 76-77, 86-89, 92-93, 95, 98.) Having considered the foregoing, I propose to find that the cognizable evidence in the record supports the following facts, which are undisputed except as specifically noted otherwise.

In December 2016, law enforcement officials executed a search warrant at Plaintiffs' home. (Doc. 196-4 at 214:18-20; *id.* at 215:25 to 216:1.) On December 13, 2016, the United States Department of Justice ("USDOJ") issued a press release indicating that Plaintiffs and others had been indicted for conspiracy to commit wire fraud, wire fraud, conspiracy to impersonate United States employees, impersonating United States employees, aggravated identity theft, conspiracy to commit money laundering, concealment money laundering, transportation money laundering, and engaging in monetary transactions in unlawful funds. (Docs. 196-5, 196-6.) The press release stated that Plaintiffs and others had been charged with defrauding investors of more than $50,000,000. (Doc. 196-6.) The related indictment alleged that the fraud "scheme was principally devised by [Rienzi] Edwards" with Plaintiffs' "assistance." (Doc. 196-5 at 4.) Each Plaintiff ultimately pleaded guilty to one count of conspiracy to impersonate a federal officer or employee. (Docs. 196-15, 196-16.) The other charges against them were dismissed.[4] (*Id.*)

Shortly after the USDOJ issued its December 2016 press release, the *Journal* assigned Defendant Nicole Perez to report on the indictment. (Doc. 196-7 at ¶¶ 1-2.) On December 15, 2016, Ms. Perez contacted Melissa Carroll, who told Ms. Perez that she resided at Plaintiffs'

---

[4] As part of their sentences, Plaintiffs, jointly and severally with others, were ordered to pay $14,000,000 in restitution. (Docs. 196-15 to 196-18.)

house.[5] (*Id.* at ¶ 5.) Ms. Carroll had been living in Plaintiffs' house since 2014, when her partner Brandon Clark asked if she could stay there with him, and Plaintiffs agreed. (Doc. 196-3 at 91:18-25; *id.* at 248:12-249:9; Doc. 196-4 at 64:19-65:23; *id.* at 69:1-70:22.) Ms. Carroll had keys to the house, kept belongings there, and received mail and other deliveries there.[6] (*Id.*)

Plaintiffs gave Ms. Carroll a copy of a written contract between Mr. Clark "and any other associated parties," on the one hand, and Northern Corridor, LLC, a company that held real estate for Plaintiffs, on the other, assuming that it bound Ms. Carroll. (Doc. 196-4 at 80:8-15; *id.* at 85:13-86:1); *see Jacobs v. Clark*, Civ. No. 23-1060 MLG/JMR (D.N.M., Doc. 13-1 at 1-3). This contract restricted Mr. Clark's authority to disclose confidential information about his and Plaintiffs' house-sitting arrangement. (*Id.*)

Ms. Carroll invited Ms. Perez to come to Plaintiffs' house to interview her. (Doc. 196-7 at ¶ 5.) Later that day, Ms. Perez and Defendant James Thompson, a *Journal* photographer, went to Plaintiffs' house, which was posted with a "No Trespassing" sign. (Doc. 196-7 at ¶¶ 6-7; Doc. 196-8 at ¶¶ 2-3; Doc. 211-1 at 3, 10; Doc. 230-6 at 25.) Plaintiffs were not present because they had been arrested and detained a few days earlier. (Doc. 196-3 at 69:1-9, 16-18; *id.* at 93:21-25; *id.* at 95:18-23; Doc. 196-4 at 24:20-23; *id.* at 31:11-35:15; *id.* at 177:7-16; *id.* at 181:11-182:11.) Ms. Carroll welcomed Ms. Perez and Mr. Thompson into the house and did not limit their access to it in any way.[7] (Doc. 196-7 at ¶¶ 6-7; Doc. 196-8 at ¶¶ 3-4.) She allowed Ms. Perez and Mr.

---

[5] Plaintiffs purport to dispute that Ms. Perez contacted Ms. Carroll, but they cite to no evidence that contradicts Defendants' evidence on this point, instead merely disputing the manner in which Ms. Perez obtained Ms. Carroll's contact information. (Doc. 211 at ¶ 44.)

[6] Plaintiffs largely concede that Ms. Carroll had resided in the house since 2014, had keys to the house, kept belongings there, and received mail and deliveries there. (Doc. 211 at ¶¶ 36-39.) As noted above, Plaintiffs do try to dispute these facts by arguing that Ms. Carroll also had other mailing addresses, kept some of her belongings in a storage unit, and only had permission to "stay temporarily" at the house. (*Id.* at ¶¶ 36, 38-39, 41.) However, these contentions are immaterial because they do not negate the facts at issue.

[7] Although Plaintiffs assert that Ms. Carroll "would not have invited [Ms. Perez and Mr. Thompson] into the home," they submit no evidence to support the assertion other than Ms. Handler Jacobs' affidavit that she does not believe

4

Thompson into Plaintiffs' living room and into Mr. Jacobs' office, which had a "Private" sign on the door. (Doc. 196-4 at 68:9-13; Doc. 196-7 at ¶¶ 6-7; Doc. 196-8 at ¶ 4; Doc. 230-6 at 26.) Ms. Perez interviewed Ms. Carroll, and Ms. Carroll allowed Mr. Thompson to take photographs of anything in the house. (Doc. 196-7 at ¶ 7; Doc. 196-8 at ¶¶ 4-5.)

Among other things, Mr. Thompson photographed a framed, four-by-six-inch print of a photograph of Plaintiffs in Cannes, France ("Cannes photograph"). (Doc. 196-3 at 32:9-10; Doc. 196-4 at 184:22-185:1; Doc. 196-8 at ¶ 5.) Mr. Thompson chose to photograph the Cannes photograph because it depicts Plaintiffs, the two subjects of Ms. Perez's article, and not because of its location or backdrop. (Doc. 196-8 at ¶ 5; Doc. 230-3 at 13, 20, 30.[8]) Mr. Thompson also took pictures of (1) a whiteboard in Mr. Jacobs' office with writing on it, (2) Ms. Carroll holding what appears to be a map, and (3) a United States Marshal's badge and identification card ("USMS badge") issued to Ms. Handler Jacobs.[9] (Doc. 80 at 2-3; Docs. 196-1, 196-2; Doc. 230-6 at 11.) The writing on the whiteboard included references to large sums of money and to Sri Lanka, one of the countries mentioned in the federal indictment. (Doc. 196-1 at 4; Doc. 196-5 at 8.) Plaintiffs attested that the USMS badge was in their bedroom a few days before Mr. Thompson photographed

---

Ms. Carroll would have done so. (Doc. 211 at ¶ 46; Doc. 211-1 at 3-4.) Ms. Handler Jacobs' affidavit is plainly not based on personal knowledge in this regard, because she had been arrested and detained when Ms. Perez and Mr. Thompson visited the house. (Doc. 196-3 at 69:1-9, 16-18; *id.* at 93:21-25; *id.* at 95:18-23; Doc. 196-4 at 24:20-23; *id.* at 31:11-36:4; *id.* at 177:7-16; *id.* at 181:11-182:11.) Her affidavit is thus not cognizable evidence of what Ms. Carroll did or did not do on that occasion.

[8] In light of Plaintiffs' *pro se* status, I have considered the exhibits to the proposed revised summary judgment motion attached to Plaintiffs' Motion to Amend (Docs. 230, 230-1) in evaluating Defendants' Motion. *See* Fed. R. Civ. P. 56(e)(4) advisory committee's note to 2010 amendment ("[T]he court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.").

[9] The USMS badge is marked "Special Deputy United States Marshal," and the accompanying identification card identifies Ms. Handler Jacobs as a "Custody Officer Contractor for U.S. Marshals Service." (Doc. 230-6 at 11.) The badge and card were issued to Ms. Handler Jacobs when she worked for a security company that contracted with the United States Marshals Service in California. (Doc. 196-4 at 52:12-53:6.) At this job, Ms. Handler Jacobs was "not really" a United States Marshal but was told to say she was. (*Id.* at 53:19-20; *id.* at 54:17-19.)

5

it, but Mr. Thompson declared that he did not go into the bedroom. (Doc. 196-4 at 245:24-246:1; Doc. 211-1 at 11; Doc. 230-3 at 22.)

The Cannes photograph was originally taken on May 20, 2016, with Ms. Handler Jacobs' cell phone. (Doc. 196-3 at 31:12-14; *id.* at 32:2-6; *id.* at 37:17-22; Doc. 196-4 at 184:12-185:4; *id.* at 186:16-19; Doc. 230-6 at 31.) It depicts Plaintiffs standing in front of two yachts docked near the Cannes Film Festival, which Plaintiffs were attending to promote a film. (Doc. 196-2 at 1; Doc. 196-3 at 32:7-25; Doc. 196-4 at 184:25-185:14.) Mr. Jacobs intended to use the photograph to publicize Plaintiffs' business endeavors. (Doc. 196-3 at 33:8-34:10; *id.* at 35:7-36:12; Doc. 196-4 at 200:8-10.) Roland Willcock, Plaintiffs' "employee," "partner," or "business associate," may have taken the picture, or Mr. Jacobs may have used a timer to take it. (Doc. 196-3 at 36:15-38:15; Doc. 196-4 at 186:16-187:20; 189:1-5; Doc. 230-6 at 32.) Mr. Jacobs arranged the photograph and selected its backdrop and lighting using his skills as a professional photographer. (Doc. 196-3 at 38:19-39:6; *id.* at 42:1-10; 196-4 at 188:18-189:23.)

When Mr. Thompson photographed it in December 2016, the Cannes photograph had only been displayed privately in Plaintiffs' home. (Doc. 196-3 at 42:21-44:4; Doc. 196-4 at 196:5-197:4). Mr. Jacobs: (1) never used the Cannes photograph for any purpose other than private display before the *Journal* published it, (Doc. 196-3 at 42:21-23; *id.* at 43:14-23); (2) has never tried to sell it or received an offer to purchase it, (*id.* at 48:3-6; *see also* Doc. 196-4 at 199:2-9; *id.* at 200:14-19); (3) has not asked anyone to appraise it or otherwise assess its value, (Doc. 196-3 at 44:5-12); and, (4) "can't really say" whether the *Journal*'s publication of it affected its value. (*Id.* at 48:10-16.) Mr. Jacobs registered the Cannes photograph with the United States Copyright Office in May 2020. (Doc. 196-3 at 27:24-29:17; Doc. 211-1 at 44.) Mr. Thompson knew the photograph did not belong to Ms. Carroll. (Doc. 230-3 at 28-29.)

6

Ms. Perez and Mr. Thompson attested that they did not remove the Cannes photograph, the USMS badge, or any other items from Plaintiffs' house when they left. (Doc. 196-7 at ¶ 9; Doc. 196-8 at ¶ 6.) Mr. Jacobs, in contrast, testified that he believes Mr. Thompson removed the Cannes photograph from the house because it was missing when Mr. Jacobs returned to the house in 2019, and because Mr. Thompson must have removed it from its frame before he photographed it because his photograph "does not have any reflections from [the] glass."[10] (Doc. 196-3 at 101:9-24.) Mr. Jacobs also attested that Mr. Thompson must have removed the Cannes photograph from the house to flatten it because the photograph, if removed from the frame, would have "curved inward," while Mr. Thompson's photograph of the photograph was flat.[11] (Doc. 211-1 at 10-11; Doc. 230-6 at 36-37.)

Mr. Jacobs testified that Ms. Perez or Mr. Thompson "could have" taken the USMS badge, but he could not "see why they would take it" and that he did not "really know exactly who took [the badge]." (Doc. 196-3 at 109:10-110:10.) He explained that he only claimed Ms. Perez and Mr.

---

[10] Mr. Thompson, however, testified that if the Cannes photograph was in a frame when he photographed it, then he left it in the frame. (Doc. 211-1 at 31.)

[11] Plaintiffs submit a photograph of the Cannes photograph "in a standard frame, with glass," that Mr. Jacobs took in 2024, in the same room and "at approximately the same time of day that [Mr.] Thompson allegedly copied the image." (Doc. 230-6 at 35.) This framed photograph is more cropped and less in focus than Mr. Thompson's photograph and has glass reflections not present in Mr. Thompson's copy. (*Id.*) In addition, Plaintiffs submit another photograph of the Cannes photograph, in a different frame, that Mr. Jacobs took at an angle "to compensate for a reflection," resulting in "angles on the borders" and a "slight[]" distortion not present in Mr. Thompson's copy. (*Id.* at 37.) Plaintiffs appear to submit this evidence to buttress Mr. Jacobs' testimony that Mr. Thompson must have taken the Cannes photograph out of its frame and removed it from Plaintiffs' house to flatten it. (*Id.*)

However, I note that Plaintiffs submit no evidence to show that either of the frames in which Mr. Jacobs photographed his reprints was the same as or materially similar to the frame the Cannes photograph was in on the day Mr. Thompson photographed it. At his deposition, Mr. Jacobs did testify that an empty, soiled, damaged frame depicted in a pleading in a different lawsuit may be the frame the Cannes photograph was in on the day Mr. Thompson photographed it. (Doc. 196-3 at 99:19-100:17); *see Jacobs*, Civ. No. 23-1060 (Doc. 13-1 at 33). But this frame is very different from the two frames in which Mr. Jacobs photographed his reprints. Moreover, the depiction of the damaged frame in the other lawsuit does not show, for example, the type of glass it included, or how much of the Cannes photograph it would have cropped. *See Jacobs*, Civ. No. 23-1060 (Doc. 13-1 at 33). I further note that Plaintiffs submit no evidence tending to show that Mr. Thompson would have had to remove the photograph from the house in order to take it out of its frame and flatten it.

Case 1:21-cv-00690-MV-JMR    Document 237    Filed 07/08/26    Page 8 of 57

Thomspon took it "as a possibility" because if he did not put it in the lawsuit the claim would be "gone." (*Id.* at 110:3-11.) In addition, Ms. Handler Jacobs testified that she believed Ms. Carroll and Mr. Clark, or others that they allowed to live in the house, took personal property from the house because "[t]hey destroyed everything in the house," "[t]hey threw everything [Plaintiffs] had away," "everything was gone," and the "house was destroyed" when she returned to it in late 2017. (Doc. 196-4 at 34:17-35:24; *id.* at 37:12-14; *id.* at 130:24-131:2; *id.* at 205:5-16; *id.* at 248:3-20; *id.* at 250:2-22; *see also* Doc. 196-3 at 234:3-235:8-239:14.) In particular, Ms. Handler Jacobs opined that it was "more likely" Mr. Clark took the USMS badge because he "was always a wanna-be cop."[12] (Doc. 196-4 at 249:20-250:1.)

Defendants William Lang, Kent Walz, Karen Moses,[13] Dean Hanson, and Elise Kaplan never went to or entered Plaintiffs' house. (Docs. 196-9 to 196-12; Doc. 196-14.) In December 2016, Mr. Lang was the *Journal*'s publisher and "very rarely had any personal involvement with the daily content" of the newspaper. (Doc. 196-14 at ¶¶ 1, 3.) He had no personal involvement with Ms. Perez's article or Mr. Thompson's photographs. (*Id.* at ¶ 4.)

Mr. Walz was the *Journal*'s editor and Ms. Moses its managing editor; neither can recall whether they worked with Ms. Perez's article or Mr. Thompson's photographs. (Doc. 196-10 at ¶¶ 1, 4; Doc. 196-11 at ¶¶ 1, 4.) Mr. Hanson was a *Journal* photographer "filling in" for a photo editor who was on leave. (Doc. 196-9 at ¶ 2.) He also does not recall whether he worked with the photographs Mr. Thompson took in Plaintiffs' home. (*Id.* at ¶ 5.) However, Mr. Thompson testified that Mr. Walz, Ms. Moses, and others "all go into a meeting, and they talk about what's going to run today in the paper," including where in the paper articles will appear. (Doc. 211-1 at 23.) Mr.

---

[12] In a subsequently filed lawsuit, Plaintiffs sued Ms. Carroll and Mr. Clark, alleging that they stole many items from Plaintiffs, including the USMS badge. *See Jacobs*, Civ. No. 23-1060 (Doc. 33 at ¶ 140).

[13] Defendant Karen Moses now goes by the name of Karen Oltmans. (Doc. 196-10 at ¶ 1.)

8

Thompson also testified that he gave his photographs "to the photo editor," who would have attended the "news meeting" at which "the editor" decided to publish the article and photographs that ultimately appeared in the *Journal*. (*Id.* at 37.) Nevertheless, Mr. Thompson did not attend the meeting and does not know what happened there. (*Id.*)

Ms. Kaplan contributed to Ms. Perez's article by locating an earlier *Journal* article about Plaintiffs and giving Ms. Perez information about that article. (Doc. 196-12 at ¶¶ 2-3.) She had no other involvement with Ms. Perez's article. (*Id.*)

On December 15 and 16, 2016, the *Journal* published at least two versions of Ms. Perez's article about the criminal charges against Plaintiffs on its website and in its print edition. (Doc. 80 at 2; Docs. 196-1, 196-2.) The article stated that, per the indictment, Rienzi Edwards was the "ringleader" of the alleged criminal scheme and Plaintiffs worked with him and others to carry it out. (Doc. 196-1 at 3-4; Doc. 196-2 at 1-2.) Mr. Thompson's photographs of the Cannes photograph, the whiteboard, and Ms. Carroll accompanied the article. (Docs. 196-1, 196-2.) In the print edition, the photograph of the Cannes photograph was cropped to remove most of its background; in the website edition, it was not. (*Compare, e.g.*, Doc. 196-1 at 1 *with* Doc. 196-2 at 1.) In both editions, the caption immediately below the Cannes photograph stated, "[t]his photo of Ruby Handler Jacobs, left, and Michael Jacobs was found at their [Northeast] Albuquerque home Thursday." (*Id.*) Mr. Thompson's photograph of the USMS badge did not appear with Ms. Perez's article but was posted on a website associated with the *Journal*. (*See* Docs. 196-1, 196-2; Doc. 196-13 at ¶ 4; Doc. 230-6 at 11, 28.)

The *Journal*'s website identified the copyright owner of Mr. Thompson's photograph of the Cannes photograph as the *Journal*. (Doc. 196-2 at 1; Doc. 230-6 at 1-2.) In digital metadata, Mr. Thompson identified himself or the *Journal* as the "creator" of his photograph of the Cannes

photograph. (Doc. 211-1 at 39-40; Doc. 230-3 at 26-27.) Mr. Thompson was aware that "the person who takes the picture is actually the owner," and that he was the creator of his "picture of a picture" but not of the original Cannes photograph. (Doc. 211-1 at 32, 34-35; Doc. 230-3 at 17, 19, 23.)

After the *Journal* published Ms. Perez's article and Mr. Thompson's photographs, the Cannes photograph appeared on other websites without Mr. Jacobs' permission, including newspapers.com (Doc. 230-6 at 7), pressreader.com (Doc. 211-1 at 46), myheritage.com (Doc. 230-6 at 77), and mancrushes.com (Doc. 230-6 at 33). With the exception of the photograph on myheritage.com, which Mr. Jacobs' niece provided to the site, Mr. Jacobs does not know how these websites obtained the Cannes photograph. (Doc. 196-3 at 59:23-62:2; *id.* at 281:6-288:20.)

Mr. Thompson's photograph of the Cannes photograph also appeared on a Zuma Press ("Zuma") website. (Doc. 196-4 at 242:6-244:5; Doc. 230-6 at 11.) The *Journal* "has had a business relationship with Zuma," pursuant to which Zuma "makes photos that appear in the *Journal* available for sale to third parties." (Doc. 196-13 at ¶ 4.) "When someone purchases such a photo through Zuma, the *Journal* receives a fee." (*Id.*) The *Journal* has no records indicating that either it or Zuma ever sold a copy of Mr. Thompson's photograph of the Cannes photograph to anyone. (*Id.* at ¶¶ 4-5.)

On July 26, 2021, Plaintiffs filed suit against the *Journal*, Ms. Perez, Mr. Thompson, Mr. Lang, Ms. Moses, and Ms. Kaplan. (Doc. 1.) Plaintiffs filed a first amended complaint on August 16, 2022, which the Court struck on October 12, 2022, because it was filed without Defendants' consent or the Court's leave. (Docs. 54, 63.) Meanwhile, on August 24, 2022, Plaintiffs sought the Court's leave to file a proposed second amended complaint, (Doc. 56); and, on June 28, 2023, the Court granted this request in part but ordered Plaintiffs to modify the proposed complaint to omit certain futile claims. (Doc. 77.) Plaintiffs thus filed their operative third amended complaint on

10

July 29, 2023, again naming the *Journal*, Ms. Perez, Mr. Thompson, Mr. Lang, Ms. Moses, and Ms. Kaplan, and also adding Mr. Walz and Mr. Hanson as Defendants.[14] (Doc. 79.)

In the operative complaint, Plaintiffs assert claims for direct and contributory copyright infringement under the Copyright Act and for providing or distributing false copyright management information ("CMI") under the Digital Millenium Copyright Act ("DMCA") (Counts 1-3).[15] (Doc. 79 at 35-37.) These claims arise out of the *Journal*'s publication of Mr. Thompson's photograph of the Cannes photograph and the manner in which the published photograph was credited. (*Id.*) Plaintiffs assert these claims against the *Journal*, Mr. Thompson, Mr. Lang, Mr. Walz, Ms. Moses, and Mr. Hanson. (*Id.*)

In addition, Plaintiffs assert six tort claims under New Mexico law (Counts 4-9). (*Id.* at 37-44.) In Counts 4 and 7, Plaintiffs assert claims of trespass and intrusion upon seclusion against Ms. Perez and Mr. Thompson based on these Defendants' entry into Plaintiffs' house. (*Id.* at 37-38, 40-41.) In Counts 5 and 6, Plaintiffs assert claims of trespass to chattel against the *Journal*, Ms. Perez, Mr. Thompson, Mr. Lang, Mr. Walz, and Ms. Moses, and claims of conversion against these Defendants and Mr. Hanson, based on Ms. Perez's and Mr. Thompson's alleged removal of the Cannes photograph and USMS badge from Plaintiffs' house.[16] (*Id.* at 38-40.) Finally, in Counts 8 and 9, Plaintiffs assert claims of public disclosure of private facts and intentional infliction of

---

[14] Plaintiffs also sued Morgan Petroski Hjelm; however, the parties stipulated to the dismissal of all claims against her on May 7, 2024. (Docs. 79, 130.)

[15] The operative complaint refers to "Plaintiffs" in Counts 1 through 3. (Doc. 79 at 35-37.) However, elsewhere, Plaintiffs acknowledge that Ms. Handler Jacobs does not own the copyright in the Cannes photograph, (Doc. 104 at 5); and, only a copyright owner may bring the Copyright Act claims asserted in Counts 1 and 2. 17 U.S.C. §§ 501(b), 504. Further, although any person injured by a violation of the DMCA may bring a claim under that Act, 17 U.S.C. § 1203, the operative complaint includes no factual allegations tending to show that any alleged violation of the DMCA injured Ms. Handler Jacobs. Rather, Plaintiffs allege only that Defendants' knowing distribution of false CMI obscured Mr. Jacobs' authorship and copyright ownership. (Doc. 79 at ¶¶ 84-85, 95-97.) I therefore recommend that the Court grant Defendants summary judgment on any claims Ms. Handler Jacobs asserts in Counts 1 through 3.

[16] Plaintiffs also allege that Ms. Perez and Mr. Thompson removed "other items" from the house. (Doc. 79 at ¶ 128.) However, Plaintiffs have never identified what these other items might be. (*See generally* Docs. 211, 230.)

emotional distress against all Defendants based on the *Journal*'s publication of Ms. Perez's article and Mr. Thompson's photographs. (*Id.* at 41-44.)

Both sides have filed motions seeking summary judgment on all claims, (Docs. 196, 213), and these motions are now before the Court. Also before the Court are Plaintiffs' Motion to Extend (Doc. 226), in which Plaintiffs seek an extension of time to reply in support of their original summary judgment motion, and their Motion to Amend, in which they seek leave to file a proposed revised summary judgment motion. (Doc. 230.) I will discuss additional procedural history relevant to specific motions below.

## II.    SUMMARY JUDGMENT STANDARDS

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(c). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw unreasonable inferences that are unsupported by the record. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008).

A summary judgment movant bears the initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). But when the movant would bear the burden of proof at trial, its initial summary judgment burden is "intensified," and it must establish all of the essential elements of its claim or defense as a matter of law. *Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015).

If the movant meets its initial burden, "the burden then shifts to the nonmovant," *id.*, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted). "[T]he moving party bears the ultimate burden of establishing its right to summary judgment as a matter of law even when it does not have the ultimate burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir. 2002).

### III. DEFENDANTS' MOTION

I begin by analyzing Defendants' Motion, filed April 18, 2025, in which Defendants seek summary judgment in their favor on all of Plaintiffs' claims. (Doc. 196.) Plaintiffs responded in opposition to the Motion on June 24, 2025, and Defendants replied in support of it on July 15, 2025. (Docs. 211, 218.)

13

**A.      Plaintiffs' Claims Against Mr. Lang, Mr. Walz, Ms. Moses, Mr. Hanson, and Ms. Kaplan**

I first note that Defendants challenge all of Plaintiffs' claims against Mr. Lang, Mr. Walz, Ms. Moses, Mr. Hanson, and Ms. Kaplan, arguing that Plaintiffs can present no facts to support a finding of individual liability against any of these Defendants. (Doc. 196 at 49-50.) In support, and as discussed in Section I., above, Mr. Lang declared that he was not involved, and Mr. Walz, Ms. Moses, and Mr. Hanson declared that they do not recall whether they were involved, with Ms. Perez's article or Mr. Thompson's photographs, while Ms. Kaplan declared that her involvement was limited to providing background research.

In response to this argument, Plaintiffs first suggest that the Court should not rely on Defendants' declarations because they are self-serving and worded in similar ways. (Doc. 211 at ¶¶ 183-86.) But parties' affidavits are virtually always self-serving and are often drafted with counsel's assistance, and courts may nevertheless rely on them at the summary judgment stage if they are based on personal knowledge and set forth admissible facts. *Greer v. City of Wichita, Kansas*, 943 F.3d 1320, 1325 (10th Cir. 2019); Fed. R. Civ. P. 56(c)(4).

More substantively, Plaintiffs point to Mr. Lang's position as the *Journal*'s publisher, and to Mr. Thompson's testimony to the effect that Mr. Walz, Ms. Moses, and Mr. Hanson attended a daily news meeting at which Mr. Walz decided to publish Ms. Perez's article and Mr. Thompson's photographs. (Doc. 211 at 23.) But with the exception of two sets of claims, this evidence is plainly insufficient to establish that Mr. Lang, Mr. Walz, Ms. Moses, Mr. Hanson, or Ms. Kaplan could be personally liable for Plaintiffs' claims.

Initially, the evidence on which Plaintiffs rely is wholly inadequate to allow a reasonable factfinder to conclude that Mr. Lang, Mr. Walz, Ms. Moses, Mr. Hanson, or Ms. Kaplan knew that they were committing an unlawful or tortious act or intended to do so. As such, it cannot support

14

any claims that require proof of such knowledge or intent. As further discussed below, Plaintiffs'

claims for contributory copyright infringement (Count 2), DMCA violations (Count 3), trespass to

chattel (Count 5), and intentional infliction of emotional distress (Count 9) all include such an

element, and Plaintiffs have thus failed to present sufficient evidence to survive summary judgment

on any of these claims against these five Defendants. Further, the evidence on which Plaintiffs rely

wholly fails to show that any of these Defendants ever entered Plaintiffs' house or took any items

from it. This eliminates any possibility that these Defendants could be held liable for trespass

(Count 4), conversion (Count 6), or intrusion upon seclusion (Count 7).

This leaves Plaintiffs' claims for direct copyright infringement (Count 1) and public

disclosure of private facts (Count 8). There is record evidence indicating that, in December 2016,

Mr. Lang was the *Journal*'s publisher and Mr. Walz made the decision to publish Ms. Perez's

article and Mr. Thompson's photographs. This evidence could support the inference that Mr. Lang

and Mr. Walz were personally involved in the alleged direct infringement of Mr. Jacobs' copyright

in the Cannes photograph and the alleged public disclosure of private facts about Plaintiffs.

However, there is insufficient evidence to allow a reasonable factfinder to conclude that Ms.

Moses, Mr. Hanson, or Ms. Kaplan either published or made the decision to publish the article and

photographs, which eliminates any possibility that these Defendants could be liable for direct

copyright infringement or public disclosure of private facts.

For all of the above reasons, I recommend that the Court grant summary judgment in

Defendants' favor on all of Plaintiffs' claims against Ms. Moses, Mr. Hanson, and Ms. Kaplan, and

on Plaintiffs' claims in Counts 2 through 7 and Count 9 against Mr. Lang and Mr. Walz.[17]

---

[17] In addition, as discussed below, I recommend that the Court grant Defendants summary judgment on all of Plaintiffs' claims except for Mr. Jacobs' (1) direct copyright infringement claims for injunctive relief against the *Journal*, Mr. Thompson, Mr. Lang, and Mr. Walz, and (2) contributory infringement claim for injunctive relief against the *Journal* based on Zuma's alleged direct infringement, because Plaintiffs have failed to show genuine, material factual disputes

**B.    Mr. Jacobs' Copyright Act and DMCA Claims (Counts 1-3)**

In Count 1 of the operative complaint, Mr. Jacobs alleges that Defendants directly infringed on his copyright in the Cannes photograph by photographing and publishing a copy of the photograph without his permission. (Doc. 79 at ¶¶ 112-14.) In Count 2, Mr. Jacobs claims that Defendants contributed to nonparties' infringement of his copyright. (*Id.* at ¶¶ 115-18.) And in Count 3, Mr. Jacobs alleges that Defendants knowingly and intentionally provided and distributed false CMI about the Cannes photograph in violation of the DMCA. (*Id.* at ¶¶ 119-22.)

Defendants present four reasons why the Court should grant summary judgment in their favor on Counts 1 through 3. First, Defendants assert that they are entitled to summary judgment on Count 1 because their use of the Cannes photograph constitutes "fair use." (Doc. 196 at 22-29.) Second, Defendants contend that they are entitled to summary judgment on Count 2 because Plaintiffs can present no evidence of another's direct, domestic infringement or that Defendants contributed to such an infringement. (*Id.* at 29-32.) Third, Defendants argue that they are entitled to summary judgment on Count 3 because there is no evidence that Defendants distributed false CMI knowingly and intentionally. (*Id.* at 32-35.) And finally, Defendants argue that they are entitled to summary judgment on all of the claims in Counts 1 through 3 because Mr. Jacobs cannot establish actual damages. (*Id.* at 18-22.) I will consider each of these arguments in turn.

1.    **Defendants are not entitled to summary judgment on the direct infringement claims in Count 1 based on "fair use."**

As just noted, among other things, Defendants argue that the Court should grant them summary judgment on Mr. Jacobs' direct copyright infringement claims in Count 1 because the

---

that would entitle them to relief. Thus, all Defendants would be entitled to summary judgment on the remainder of the claims in Counts 1 and 2, and on the claims in Counts 3 through 9, regardless of whether they were personally involved in the events forming the basis of these claims.

16

*Journal*'s publication of Mr. Thompson's photograph of the Cannes photograph constituted fair use. (Doc. 196 at 22-29.) The fair-use doctrine, which is codified in Section 107 of the Copyright Act, allows courts "to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990). Section 107 provides that "the fair use of a copyrighted work, including such use by reproduction in copies … , for purposes such as criticism, comment, *news reporting*, teaching… , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added).

The statute lists four factors to be considered in determining whether an alleged infringement is "fair use":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Courts should not consider these factors in isolation but should instead explore all of them and weigh the results together "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). Fair use is an affirmative defense that the proponent bears the burden of proving. *Id.* at 590.

In assessing the first fair-use factor, courts must focus "on whether an allegedly infringing use has a further purpose or different character" from the original use. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 525 (2023) ("*Andy Warhol*"). This "is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism." *Id.* A use that has a further purpose or different character is said to be "transformative." *Id.*; *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 174 F.4th 761, 782 (10th Cir. 2026); *see also Campbell*, 510 U.S. at 579 (explaining that a transformative use "adds something

new, with a further purpose or different character, altering the [original] with new expression, meaning, or message").[18]

Defendants argue that their use of the Cannes photograph was transformative under *Núñez v. Caribbean International News Corp.*, 235 F.3d 18 (1st Cir. 2000), because the "object of Plaintiffs' intended use was for business promotion or home display; the *Journal*'s use was for identifying Plaintiffs as part of reporting on an important news story." (Doc. 196 at 26.) But in so arguing, Defendants overestimate the similarity of the *Núñez* facts to the facts presented here. In *Núñez*, a photographer took controversial pictures of a model for her portfolio. 235 F.3d at 21. The alleged infringer used one of the photographs, not merely to depict the model, but also to inform its readers about the controversy surrounding it. *Id.* In light of "the informative nature of the use, [the alleged infringer's] good faith, and the fact that it would have been difficult to report the news without reprinting the photograph," the *Núñez* court found that the purpose and character of the allegedly infringing use was "either neutral or favor[ed] a finding of fair use." *Id.* at 23.

In contrast, when the news media use a photograph or other copyrighted work merely to depict the subject described in an article and not to comment on, criticize, or develop a news story about the work itself, courts have found the use to be non-transformative. *See Philpot v. Indep. J. Rev.*, 92 F.4th 252, 258-59 (4th Cir. 2024) (news website's use of stock photograph of Ted Nugent solely to depict him was not transformative); *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 264 (4th Cir. 2019) (website's use of photograph solely to depict subject neighborhood was non-transformative); *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (magazine

---

[18] A transformative work furthers the goal of copyright because it promotes the progress of science and the arts without diminishing the original author's incentive to create, while a non-transformative work is "more likely to provide the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which undermines the goal of copyright." *Andy Warhol*, 598 U.S. at 531–32 (quotations, brackets, and citations omitted).

publisher's use of celebrity couple's wedding photographs was non-transformative despite its separate purpose because a "difference in purpose is not quite the same thing as transformation" and the publisher "left the inherent character of the images unchanged"); *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 351-52 (S.D.N.Y. 2017) (media group's use of paparazzi photographs was non-transformative where group used the images "in the same manner and for the same purpose as they were originally intended to be used"); *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 404-05 (S.D.N.Y. 2016) (website operator's use of celebrity photographs was not transformative where it did not "comment or report on the images" and added "no new meaning or expression" to them); *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 185-86 (D. Mass. 2007) (broadcasting corporation's use of photograph of alleged mobster's arrest was non-transformative where "[t]he only 'transformation' was that [the] arrest was downgraded from breaking news to a supplementary part of a larger story").

Here, it is undisputed that Defendants' purpose in using the Cannes photograph was at least somewhat distinct from Plaintiffs' purpose. Both purposes had a commercial element, but Plaintiffs intended to use the photograph for private display and self-promotion, while Defendants used it to illustrate a newspaper article. Nevertheless, there is no evidence that the article in question commented on or criticized the Cannes photograph, developed a story about it, or otherwise added to its meaning or expression. Rather, as discussed in Section I., Mr. Thompson chose to photograph the Cannes photograph simply because it depicted the subjects of Ms. Perez's article. Thus, viewing the record evidence in Plaintiffs' favor, a reasonable decisionmaker could conclude that Defendants' use of the Cannes photograph was non-transformative and that the first factor listed in Section 107 weighs against a finding of fair use.

19

The second fair-use factor – the nature of the copyrighted work – "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Creative or fictional works are closer to the core of copyright and therefore less likely to be fairly used than factual works. *Id.* When photographers have "captured their subjects in public, as they naturally appeared, and were not tasked with directing the subjects, altering the backdrops, or otherwise doing much to impose creative force on the [i]mages or infuse the [i]mages with their own artistic vision," the resulting photographs are "essentially factual in nature." *Barcroft Media, Ltd.*, 297 F. Supp. 3d at 354. Conversely, "[p]hotographs that are meant to be viewed by the public for informative and aesthetic purposes" are "generally creative in nature." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003).

In addition, "the unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use" because, "under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Monge*, 688 F.3d at 1177-78 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 555 (1985)) (emphases and brackets omitted); *see also Blanch v. Koons*, 467 F.3d 244, 256 (2nd Cir. 2006) ("[T]he scope for fair use involving unpublished works [is] considerably narrower.").

Here, the evidence does not conclusively establish that the Cannes photograph is either purely creative or purely factual. As discussed in Section I., above, on the one hand, there is evidence that Mr. Jacobs used his skills as a professional photographer to arrange the photograph and select its backdrop and natural lighting. On the other hand, Plaintiffs are depicted "in public, as they naturally appeared," and there is no evidence that Mr. Jacobs did anything else to infuse

the photograph with his creative or artistic vision. *Barcroft Media, Ltd.*, 297 F. Supp. 3d at 354. Also, the record evidence suggests that the Cannes photograph was not "meant to be viewed by the public for informative and aesthetic purposes," but rather was taken for private display and future commercial self-promotion. *Kelly*, 336 F.3d at 820.

It is also important that the Cannes photograph was unpublished when Mr. Thompson photographed it, which narrows the scope of the fair-use doctrine as applied to it. *Blanch*, 467 F.3d at 256. In other words, a reasonable decisionmaker could find that this case presents the sort of "ordinary circumstances" in which Mr. Jacobs' "right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Harper & Row, Publishers, Inc.*, 471 U.S. at 555. In sum, a reasonable decisionmaker, viewing the evidence in Plaintiffs' favor, could conclude that the second factor listed in Section 107 weighs against a finding of fair use.

Under the third fair-use factor, *i.e.*, the substantiality of the portion used in relation to the work as a whole, "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87. "[C]opying an entire work militates against a finding of fair use," while copying only as much as necessary for the intended secondary use does not. *Kelly*, 336 F.3d at 820-21; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2nd Cir. 2014). Here, it is undisputed that Defendants cropped Mr. Thompson's photograph of the Cannes photograph in the *Journal*'s print edition but used the whole photograph on its website. Viewed in Plaintiffs' favor, a reasonable decisionmaker could conclude that this factor weighs against Defendants' fair-use defense, particularly as to the website copy.

In assessing the final fair-use factor, *i.e.*, the effect of the allegedly infringing use on the potential market for or value of the copyrighted work, courts must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted

21

and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original" or derivative works.[19] *Campbell*, 510 U.S. at 590 (quotation marks and ellipsis omitted). Because "fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Id.* (footnote omitted).

Here, a reasonable decisionmaker could conclude that Defendants merely duplicated the Cannes photograph for a commercial purpose, which would "mak[e] it likely that cognizable market harm to the original will occur." *Id.* at 591. Defendants attempt to resist this inference by arguing that Mr. Jacobs has "no evidence that the photograph had any market value." (Doc. 196 at 29.) But because fair use is an affirmative defense, Defendants bear the burden to show that their use of the photograph had no effect on its market value, *Campbell*, 510 U.S. at 590, and cannot rely on the mere absence of evidence regarding market value to establish their defense.[20] Nor do Defendants point to any other evidence to negate the reasonable inference of market harm that could arise if Defendants' use was mere commercial duplication of the entire photograph. In short,

---

[19] "Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Campbell* 510 U.S. at 591 n.21. For example,

> when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur. But when, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred.

*Id.* at 591 (quotation marks, brackets, and citations omitted).

[20] However, as discussed in Section III.B.4.a., below, Defendants *can* rely on the absence of any cognizable evidence that the Cannes photograph had a market value in seeking summary judgment on the issue of whether Defendants' alleged copyright infringement caused Mr. Jacobs to incur actual economic damages, because Mr. Jacobs bears the burden of proof on this issue. *See, e.g., Smith v. Thomas*, 911 F.3d 378, 381 (6th Cir. 2018) ("Actual damages must be proven by a preponderance of the evidence, like any other element of a claim."); *see also generally Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 683 (2014) ("As in other civil litigation, a copyright owner bears the burden of establishing a prima facie case.").

a reasonable decisionmaker viewing the evidence in Plaintiffs' favor could conclude that this factor also weighs against a finding of fair use.

In light of the foregoing, Defendants have not met their burden to establish that their use of the Cannes photograph was fair as a matter of law. Although "news reporting" has an informative aspect and is one statutory example of a possible fair use, *see* 17 U.S.C. § 107, courts have been wary of granting summary judgment based on fair use when a media entity has used an image solely to present its content. *BWP Media USA, Inc.*, 196 F. Supp. 3d at 407 (collecting cases); *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 198–99 (S.D.N.Y. 2021). For all of these reasons, I recommend that the Court deny Defendants' Motion to the extent that it seeks summary judgment on Mr. Jacobs' direct copyright infringement claims based on fair use.

2. **Defendants are entitled to summary judgment on the contributory infringement claims in Count 2.**[21]

In support of their request for summary judgment on Mr. Jacobs' contributory copyright infringement claims, Defendants argue that Mr. Jacobs has provided no evidence of any direct, domestic infringement of the Cannes photograph by another. (Doc. 196 at 31-32.) Defendants further argue that, even assuming he has shown such infringement, he has provided no evidence that Defendants contributed to it. (*Id.*) Mr. Jacobs disagrees on both points. (Doc. 211 at ¶¶ 64, 148.)

"One infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

---

[21] At times, Mr. Jacobs has alleged or argued that Defendants are liable for nonparties' copyright infringement based on vicarious as well as contributory infringement. (*See, e.g.,* Doc. 79 at 13; Doc. 230-1 at 24.) However, he has offered no evidence that any Defendant ever "profit[ed] from [a nonparty's] direct infringement while declining to exercise a right to stop or limit it," as would be required to support a vicarious infringement claim. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). Thus, to the extent that Mr. Jacobs intends to assert vicarious infringement claims based on nonparties' alleged infringing uses of the Cannes photograph, in addition to or in lieu of contributory infringement claims, Defendants are entitled to summary judgment on those claims.

The Tenth Circuit has identified three elements of this theory of liability: (1) another's direct infringement; (2) the defendant knows of the other's infringement; and (3) the defendant causes or materially contributes to the other's infringement. *Greer v. Moon*, 83 F.4th 1283, 1287 (10th Cir. 2023). "[T]o be deemed a contributory infringer, the authorization or assistance must bear some direct relationship to the infringing acts, and the person rendering such assistance or giving such authorization must be acting in concert with the [direct] infringer." *Id.* at 1287–88.

Here, as discussed in Section I., Mr. Jacobs does present evidence that the Cannes photograph appeared on nonparty websites without his permission. However, with the exception of one website, he has pointed to no evidence tending to show that any Defendant knew of and caused or materially contributed to the infringement or acted in concert with any of the websites. Mr. Jacobs' lack of knowledge about how these other websites obtained the Cannes photograph – and his belief that his niece gave the photograph to one of them – further undermine his contributory infringement claims.

The one exception is the Zuma website. It is undisputed that the *Journal* had an ongoing business relationship with Zuma, pursuant to which Zuma posted photographs appearing in the *Journal* for sale to the public, including Mr. Thompson's photograph of the Cannes photograph. These facts could support the inference that the *Journal* knew about and caused or materially contributed to Zuma's alleged infringement of Mr. Jacobs' copyright and acted in concert with Zuma in this regard. Thus, Defendants have failed to show that they are entitled to summary judgment on Mr. Jacobs' contributory infringement claim against the *Journal* based on Zuma's alleged direct infringement.[22] As to the rest of the nonparty websites Mr. Jacobs identifies,

---

[22] However, as discussed in Section III.B.4., below, the only remedy available to Mr. Jacobs pursuant to any of his copyright infringement claims is injunctive relief.

however, a reasonable factfinder could not conclude that Defendants are liable for contributory infringement, and Defendants are therefore entitled to summary judgment on all of the other contributory infringement claims in Count 2.

3.  **Defendants are entitled to summary judgment on the DMCA claims in Count 3.**

The DMCA makes it unlawful to "knowingly and with the intent to induce, enable, facilitate, or conceal infringement: (1) provide copyright management information (CMI) that is false, or (2) distribute or import for distribution [CMI] that is false." 17 U.S.C. § 1202(a). CMI includes the name of, and other identifying information about, the author and copyright owner of a work. 17 U.S.C. § 1202(c)(2), (3). Section 1202(a) expressly requires a showing of "double scienter," that is, a plaintiff must show that the defendant engaged in a prohibited act both knowingly and with the intent to induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1202(a); *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2nd Cir. 2018).

In seeking summary judgment on Mr. Jacobs' DMCA claims, Defendants argue that Mr. Jacobs has presented no evidence that they distributed false CMI about Mr. Thompson's photograph of the Cannes photograph or that they did so knowingly and with the requisite intent. (Doc. 196 at 34-35.) For the following reasons, I agree.

Importantly, as discussed in Section I., the *Journal* published Mr. Thompson's photograph of the Cannes photograph above a caption that stated, "[t]his photo of [Plaintiffs] was found at their [Northeast] Albuquerque home Thursday." Read in conjunction with this caption, the credits and metadata on which Mr. Jacobs relies to support his DMCA claims accurately communicate that the published copy of the Cannes photograph is Mr. Thompson's photograph of a photograph found in Plaintiffs' home. In these circumstances, even assuming Defendants provided or distributed false CMI about the Cannes photograph, a reasonable factfinder could not conclude

that they did so knowingly and with the intent to induce, enable, facilitate, or conceal copyright infringement. Defendants are therefore entitled to summary judgment on the DMCA claims in Count 3 of Plaintiffs' operative complaint.

### 4. Defendants are entitled to summary judgment on Mr. Jacobs' copyright infringement claims for statutory, punitive, and actual damages, profits, and attorney's fees, but not injunctive relief.

Finally, Defendants argue that they are entitled to summary judgment on Mr. Jacobs' direct and contributory copyright infringement claims in Counts 1 and 2 because Mr. Jacobs cannot prove that he incurred any actual damages as a result of, or that Defendants earned any profits attributable to, any alleged infringement.[23] (Doc. 196 at 18-22.) In support, Defendants reason as follows. Defendants begin by noting that the Copyright Act prohibits Mr. Jacobs from recovering statutory damages or attorney's fees pursuant to his infringement claims because he did not register the Cannes photograph with the Copyright Office until several years after the alleged infringements began. (*Id.*) Next, Defendants argue that the Copyright Act does not allow Mr. Jacobs to recover punitive damages. (*Id.*) Thus, Defendants conclude, the only damages Mr. Jacobs could theoretically recover are actual damages and a disgorgement of profits. (*Id.*) Defendants contend, however, that Mr. Jacobs' evidence is insufficient to show a genuine, material factual dispute regarding whether the alleged infringements at issue caused him to suffer actual damages or resulted in Defendants earning a profit. (*Id.*)

A plaintiff's remedies for copyright infringement are limited to those Congress has prescribed. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984). The

---

[23] Defendants argue that they are also entitled to summary judgment on the DMCA claims in Count 3 due to Mr. Jacobs' inability to prove actual damages or profits. (Doc. 196 at 18-22.) I do not address this argument because I recommend that the Court grant Defendants summary judgment on Count 3 for other reasons, as discussed in Section III.B.3., above. I do note, however, that the damages provisions of the Copyright Act and the DMCA are not identical. *Compare, e.g.*, 17 U.S.C. § 504 *with* 17 U.S.C. § 1203(c).

Copyright Act provides that an infringer may be liable for *either* actual damages and profits *or* statutory damages, but not both. 17 U.S.C. § 504(a). Specifically, the Copyright Act gives a successful plaintiff the right "to recover the actual damages suffered by him or her as a result of the infringement" and "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Alternatively, the Act provides that "instead of actual damages and profits," a successful plaintiff may recover a specified range of statutory damages. 17 U.S.C. § 504(c)(1), (2). The top of the range increases if the infringement is found to be willful. *Id.* The Act also allows a prevailing party to recover its attorney's fees. 17 U.S.C. § 505.

However, except in limited circumstances not applicable here, a plaintiff may not recover statutory damages or attorney's fees where "any infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. § 412. By allowing an award of statutory damages and attorney's fees only "to those who register promptly, Congress intended that § 412 provide copyright owners with an incentive to register early and often." *Wilson v. Brennan*, 666 F. Supp. 2d 1242, 1264 (D.N.M. 2009) (Lynch, J.) (quotation marks omitted), *aff'd*, 390 F. App'x 780 (10th Cir. 2010).[24]

Because the Copyright Act sets forth the available damages remedies for copyright infringement and does not provide for punitive damages other than the increased statutory damages range for willful violations, courts have found that punitive damages are not available under the Act. *See, e.g., Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 393 (3rd Cir. 2016); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 545 (4th Cir. 2007); *Bucklew v. Hawkins, Ash, Baptie*

---

[24] Unpublished decisions are not binding precedent in the Tenth Circuit but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

*& Co., LLP.*, 329 F.3d 923, 934 (7th Cir. 2003); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2nd Cir. 2001), *as amended* (May 15, 2001); *Bethel v. Sandia Aerospace Corp.*, Civ. No. 20-596, 2023 WL 2043302, at *12 (D.N.M. Feb. 16, 2023) (Vázquez, J.).

Here, it is undisputed that the Cannes photograph was unpublished before Mr. Thompson's photograph of it appeared in the *Journal*, and that Mr. Jacobs did not register the Cannes photograph with the Copyright Office until several years after the alleged infringements began. Thus, as noted in previous rulings in this case, (*see, e.g.,* Doc. 49 at 8), Mr. Jacobs may not recover statutory damages or attorney's fees pursuant to his infringement claims. Further, he may not recover punitive damages regardless of when he registered the copyright. It follows that the only remedies Mr. Jacobs could possibly obtain pursuant to his infringement claims are an award of actual damages, the disgorgement of Defendants' profits, and injunctive relief. 17 U.S.C. §§ 502, 503, 504(b). I will address the viability of Mr. Jacobs' claims for each of these remedies in turn.

a.      Actual Damages

Under the Copyright Act, "the phrase 'actual damages' means the copyright owner's economic loss caused by infringement." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1227-29 (D. Utah 2018); *see also Shell v. Henderson*, Civ. No. 09-309, 2013 WL 4838907, at *4 (D. Colo. Sept. 10, 2013) (holding that Copyright Act precludes non-economic damages). Actual damages may be direct or indirect but may not be "unduly speculative." *Cohen v. United States*, 100 Fed. Cl. 461, 481 (Fed. Cl. 2011). Courts guard against speculation when assessing actual damages under the Copyright Act because a plaintiff that has timely registered its work may seek statutory damages when actual damages are speculative or difficult to prove. *See, e.g., Smith v. Thomas*, 911 F.3d 378, 381 (6th Cir. 2018); *Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc.*, 329 F.2d 194, 196-97 (2nd Cir. 1964).

28

Typically, actual damages are measured by "the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement." *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013) (quoting *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1118 (2nd Cir. 1986)); *Nunes*, 299 F. Supp. 3d at 1227-28 (same); *see also F.A.A. v. Cooper*, 566 U.S. 284, 293 (2012) (noting Ninth Circuit's adoption of this definition of "actual damages" under Copyright Act). Ultimately, a plaintiff must show that "the thing taken had a fair market value." *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016); *Dash*, 731 F.3d at 312; *On Davis*, 246 F.3d at 166.

Here, as a matter of law, Mr. Jacobs' proffered economic damages are too speculative to be actionable. Initially, as discussed in Section I., above, it is undisputed that: (1) Plaintiffs used the Cannes photograph only for private display before the *Journal* published Mr. Thompson's photograph of it; (2) Mr. Jacobs has never tried to sell it and no one has ever offered to purchase it; (3) he has not asked anyone else to appraise it or assess its value; and, (4) he cannot say whether the *Journal*'s publication of Mr. Thompson's photograph of it affected its value.

Attempting to establish that the Cannes photograph nevertheless had a fair market value, Mr. Jacobs argues that other photographs he has taken have been appraised to be worth $900 to $6,000 per use. (Doc. 211 at ¶ 137.) Mr. Jacobs further argues that the Cannes photograph necessarily had a fair market value because he "makes his living from selling his photographs and taking on assignments for a fee." (*Id.* at ¶ 133.) In support, he lists businesses that have published his images without indicating how he claims these businesses compensated him or the nature of the images he claims they published. (Doc. 211-1 at 42-43.)

Mr. Jacobs also relies on *Cuffaro v. Fashionisto LLC*, to suggest that a generalized value of $1,500 for copyrighted photographs is reasonable. (Doc. 211 at ¶ 136 (citing *Cuffaro v.*

29

*Fashionisto LLC*, Civ. No. 19-7265, 2020 WL 5077449 (S.D.N.Y. Jul. 9, 2020), *report and recommendation adopted*, Civ. No. 19-7265, 2020 WL 5076826 (S.D.N.Y. Aug. 27, 2020)).) But this reliance is unavailing. In *Cuffaro*, the plaintiff provided evidence that a photograph similar to his photograph was licensed at Getty Images for $2,050 and that he would charge $1,500 to license his photograph. *Cuffaro*, 2020 WL 5077449, at *4. But here, Mr. Jacobs has presented no such evidence, and in particular has failed to provide any evidence to show that the Cannes photograph was similar to any other photograph sold or licensed for compensation.

Finally, Mr. Jacobs asserts that he intended to use the Cannes photograph to promote Plaintiffs' business endeavors and that the *Journal*'s publication of it "ruined" this anticipated future use. (Doc. 211 at ¶ 137.) In their operative complaint, Plaintiffs elaborate that Mr. Jacobs can no longer use the photograph in this way because Defendants "falsely connected the Cannes photograph with an alleged criminal activity." (Doc. 79 at ¶¶ 82, 149.) But no reasonable factfinder could conclude that Defendants falsely connected the Cannes photograph with the crimes for which Plaintiffs were indicted. On the contrary, as discussed in Section I., the *Journal*'s caption simply indicated that the Cannes photograph depicted Plaintiffs and was found at their home. Moreover, although Ms. Perez's article did connect Plaintiffs with alleged criminal activity, any reasonable factfinder would conclude that the connection the article made was true and accurate.

Further, Mr. Jacobs has offered no evidence of the value of his anticipated promotional campaign either with the photograph or without it. Courts have consistently rejected claims for actual damages, like Mr. Jacobs' here, that rest on speculative future injury to a business interest. *Bell*, 827 F.3d at 708-09; *Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.*, 978 F.2d 430, 432 (8th Cir. 1992) (holding that plaintiff's evidence of actual damages "was simply too speculative" absent evidence of, for example, its "normal profit margin for comparable work");

30

*Monitor Studios, LLC v. Reddick*, Civ. No. 04-940, 2006 WL 8438683, at *2 (E.D.N.C. Sept. 22, 2006) (rejecting actual damages claim based on speculative estimate regarding loss of subscribers); *Iconbazaar, L.L.C. v. Am. Online, Inc.*, 378 F. Supp. 2d 592, 595 (M.D.N.C. 2005) (granting defendant summary judgment on infringement claim where plaintiff offered "nothing more than mere speculation as to any licensing fees that it may have been due").

I note that in addition to the arguments and evidence regarding actual damages that he presents in Plaintiffs' response to Defendants' Motion, Mr. Jacobs presents two arguments in the proposed revised summary judgment motion attached to Plaintiffs' Motion to Amend. As discussed in Section IV., below, I recommend that the Court deny the Motion to Amend and disallow the proposed revised motion. But even if the Court were to grant the Motion to Amend and entertain the proposed revised motion, Mr. Jacobs' actual damages would be too speculative to survive summary judgment.

First, in the proposed revised motion, Mr. Jacobs asserts that he "uses $300 as a common licensing fee he receives." (Doc. 230-1 at 51-52 & n.43.) In support, Mr. Jacobs submits a "Material License Agreement" that he sent to NBC News regarding a different photograph, purporting to grant NBC News a license to use the photograph for $300. (Doc. 230-6 at 22.) And elsewhere in the Motion to Amend, Mr. Jacobs asserts that he issued delivery memos regarding other photographs in which he purported to charge recipients a $1,500 fee for lost photographs, attaching one such memo addressed to *People* as evidentiary support. (Doc. 230-1 at 12; Doc. 230-6 at 21.) However, absent from the record is any indication that NBC or *People* accepted Mr. Jacobs' price terms or actually paid for the use or loss of the photographs in question. And critically, even if one were to infer that they did, neither document establishes that the Cannes photograph was in any way similar to the photographs referenced in those documents.

31

For his second argument in Plaintiffs' proposed revised motion, Mr. Jacobs points to Plaintiffs' "Affidavit for Sum Certain," in which they assign a value of $1,500 to the Cannes photograph. (Doc. 230-7 at 1-2.) But a plaintiff's "subjective belief as to the fair market value of his photo is not enough to prove damages." *Bell*, 827 F.3d at 709. Other courts have rejected claims for actual damages based solely on the plaintiff's estimate of the value of a copyrighted work. *Proimos v. Madison Prop. Grp.*, Civ. No. 20-4832, 2021 WL 4391238, at *2 (S.D.N.Y. Sept. 24, 2021) (rejecting speculative actual damages claim based on Getty Images price calculator); *Bachner v. USA Halloween Planet, Inc.*, Civ. No. 19-64, 2020 WL 1862191, at *2 (N.D. Ind. Apr. 13, 2020) (rejecting plaintiff's estimate of copyrighted work's value absent additional evidence); *see also New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*, Civ. No. 11-149, 2013 WL 1861491, at *2 (W.D. Okla. May 2, 2013) (noting that evidence of average price of customized maps was inadequate to prove actual damages); *William Wade Waller Co. v. Nexstar Broad., Inc.*, Civ. No. 10-764, 2011 WL 2648584, at *3 (E.D. Ark. July 6, 2011) (holding that plaintiff's general assertion that his work was valuable was insufficient to establish actual damages).

In sum, Mr. Jacobs' argument that Defendants' alleged infringement diminished the value of the Cannes photograph and caused him economic harm lacks any adequate evidentiary support. Rather, like the claims in *Bell* and other cases cited above, Mr. Jacobs' claims for actual damages rest on mere speculation, which is insufficient to defeat Defendants' Motion. *Bell*, 827 F.3d at 708-09. Because Mr. Jacobs has not shown a genuine issue of material fact as to whether he suffered actual damages due to Defendants' alleged direct and contributory infringement, Defendants are entitled to summary judgment on Mr. Jacobs' claims for such damages.

b.    Recovery of Profits

In addition to actual damages, the Copyright Act allows a plaintiff to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). "If the infringer has earned a profit, this award makes him disgorge the profit to insure that he not benefit from his wrongdoing." *On Davis*, 246 F.3d at 159. Like actual damages, recoverable "profits can be either direct or indirect." *I Dig Texas, LLC v. Creager*, 98 F.4th 998, 1007 (10th Cir. 2024) (emphases omitted).

> The profits would be considered *direct*, for example, when an infringer sells the copyrighted work itself. And the profits would be considered *indirect*, for example, when the infringer … enhances operations by infringing on a copyright, or … adds sales because its advertisements included copyrighted images.

*Id.* (emphases and citations omitted).

To establish recoverable profits under the Copyright Act, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Nevertheless, before Section 504(b)'s burden-shifting provision applies, a copyright owner must meet the threshold "burden to show a nexus between the use of the copyrighted [work] and the making of a profit." *I Dig Texas*, 98 F.4th at 1008. In other words, "a copyright holder must show more than the infringer's total gross revenue from all of its profit streams." *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005). Rather, "gross revenue" as used in Section 504(b) refers only to revenue "reasonably related to the infringement." *Id.*; *On Davis*, 246 F.3d at 160; *Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 334-35 (S.D.N.Y. 2019); *New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*, Civ. No. 11-149, 2012 WL 12863152, at *7 (W.D. Okla. Nov. 9, 2012).

33

In support of his claims for disgorgement of Defendants' profits, Mr. Jacobs argues that Defendants must have profited from the alleged infringement indirectly because the *Journal* used the Cannes photograph "on [its] website and print edition, with advertisements," placing the photograph "above the fold." (Doc. 211 at ¶¶ 138-39.) Mr. Jacobs also argues that Defendants could have profited from the alleged infringement directly because the *Journal*, on its own and through Zuma, offers its published photographs for sale. (*Id.* at ¶ 140; *see* Doc. 196-13 at ¶¶ 4-5.) But Mr. Jacobs' arguments lack adequate evidentiary support in two important ways.

First, Mr. Jacobs presents no evidence of the fact or amount of any gross revenues the *Journal* or Mr. Lang earned that are reasonably related to the alleged infringement, whether directly or indirectly. In particular, he presents no evidence that these Defendants ever profited from the alleged infringement either (a) directly because they sold Mr. Thompson's photograph of the Cannes photograph or (b) indirectly because their publication of the photograph enhanced their operations or added to their sales. Nor does Mr. Jacobs make any attempt to quantify any gross revenue the *Journal* or Mr. Lang might have earned in either of these ways.

Second, Mr. Jacobs fails to present any evidence, or even a plausible argument, tending to show that any other individual Defendant, including Mr. Thompson or Mr. Walz, could have earned profit from the *Journal*'s and Mr. Lang's publication of Mr. Thompson's photograph of the Cannes photograph. (*See generally* Docs. 211, 230-1.) In sum, Mr. Jacobs has failed to demonstrate a genuine issue of material fact regarding an essential element of his profits claims, *i.e.*, the fact and amount of any Defendant's gross revenue that is reasonably related to the alleged infringement of his copyright in the Cannes photograph. Defendants are therefore entitled to summary judgment on to Mr. Jacobs' infringement claims for a disgorgement of profits.

34

c.        Injunctive Relief

Finally, the Prayer for Relief in Plaintiffs' operative complaint includes several requests for injunctive relief that, construed liberally, arise out of Mr. Jacobs' copyright infringement claims. (Doc. 79 at 45-46 ¶¶ A-D); *see Eaves v. Polis*, 167 F.4th 1304, 1308 (10th Cir. 2026) (noting that courts construe *pro se* plaintiffs' pleadings liberally). Defendants do not address these requests in their Motion and have thus failed to meet their initial burden to show that they are entitled to summary judgment as to this requested relief. (*See generally* Docs. 196, 218); *Adler*, 144 F.3d at 670-71. I therefore recommend that the Court deny Defendants' Motion as to Mr. Jacobs' direct infringement claims for injunctive relief against the *Journal*, Mr. Thompson, Mr. Lang, and Mr. Walz, and his contributory infringement claim for injunctive relief against the *Journal* based on nonparty Zuma's alleged direct infringement.[25]

**B.    Plaintiffs' Tort Claims (Counts 4-9)**

In their operative complaint, Plaintiffs raise six tort claims: trespass (Count 4), trespass to chattel (Count 5), conversion (Count 6), intrusion on seclusion (Count 7), public disclosure of private facts (Count 8), and intentional infliction of emotional distress (Count 9). (Doc. 79 at 37-44.) Because the events underlying these tort claims took place in New Mexico, I apply New Mexico law to analyze the claims. *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996).

---

[25] The Copyright Act authorizes courts to issue "injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Entitlement to monetary damages is not an element of a copyright claim seeking injunctive relief. *See, e.g., On Davis*, 246 F.3d at 158-59; *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.,* Civ. No. 09-970, 2013 WL 1129404, at *6 (D. Colo. Mar. 18, 2013).

1.    Trespass – Count 4

Under New Mexico law, common law civil trespass is a tangible infringement of another's possessory interest in land.[26] *See McNeill v. Rice Eng'g & Operating, Inc.*, 2010-NMSC-015, ¶ 7, 229 P.3d 489, 492; *Padilla v. Lawrence*, 1984-NMCA-064, ¶ 26, 685 P.2d 964, 971; *see also Dolan v. Fed. Emergency Mgmt. Agency*, 760 F. Supp. 3d 1200, 1247-48 (D.N.M. 2024) (Browning, J.). But conduct that would otherwise constitute a trespass is not a trespass if it is privileged, such as when a possessor consents to the defendant's entry onto land. Restatement (Second) of Torts § 158 cmt. e[27]; *Doe v. Santa Fe Pub. Schs.*, Civ. No. 23-1025, 2024 WL 4527750, at *5 (D.N.M. Oct. 18, 2024) (Wormuth, J.) (*citing* N.M. U.J.I. 13-1301); *Bixby v. Reynolds Min. Corp.*, 1992-NMSC-017, ¶ 7, 826 P.2d 968, 969-71 (noting that "any prospecting done on [possessor's lode claim on public lands] *without his consent* would be a trespass") (emphasis added); *see also Salisbury Livestock Co. v. Colo.  Cent. Credit Union*, 793 P.2d 470, 475 (Wyo. 1990) (holding that possessor's consent is "absolute defense" to trespass); *Antioch Woods, L.P. v. Best Buy Co.*, 2000 WL 36746151, at *8 (Kan. App. Dec. 1, 2000) (same).

The Restatement (Second) of Torts defines a possessor as, among others, a person who "is in occupancy of land with intent to control it." Restatement (Second) of Torts § 157(a). A "known temporary occupant" is a possessor who can consent to another's entry onto land. *Doe*, 2024 WL 4527750, at *5.

---

[26] Although Plaintiffs allege that Ms. Perez and Mr. Thompson "criminally trespass[ed]" on their property because the property was posted with a "no trespassing" sign and Defendants entered it without written permission, New Mexico's criminal trespass statute does not create a private right of action other than for damages to realty or its improvements, which Plaintiffs have not alleged. (Doc 79 at ¶ 66); N.M. Stat. Ann. §§ 30-14-1(D), 30-14-1.1(D). Defendants are thus entitled to summary judgment on Plaintiffs' criminal trespass claims. Nevertheless, because Plaintiffs are proceeding *pro se*, I construe their operative complaint liberally to allege common law civil trespass claims as well.

[27] The New Mexico Supreme Court has "been very willing to adopt the view of the Restatement of Torts" in developing New Mexico tort law. *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 49, 785 P.2d 726, 736.

36

Defendants argue that they are entitled to summary judgment on Plaintiffs' trespass claims because Ms. Carroll consented to Ms. Perez's and Mr. Thompson's entry onto Plaintiffs' property. (Doc. 196 at 37.) Plaintiffs disagree, for two reasons. (Doc. 211 at ¶¶ 155-62.) First, Plaintiffs argue that Ms. Carroll had no authority to give Ms. Perez and Mr. Thompson permission to enter the property. (*Id.* at ¶ 156.) Second, Plaintiffs contend that a "no trespassing" sign on the property barred these Defendants from entering. (*Id.* at ¶ 157.)

The crux of Plaintiffs' first argument is that Ms. Carroll, despite having lived in their house for over two years, could not consent to others' entry onto the property because she was just a house sitter and so did not "have control" over it. (*Id.* at ¶ 156.) But Plaintiffs cite no law that supports this argument. To the contrary, even if Ms. Carroll was merely a house sitter – which is at least questionable given the nature and extent of her occupancy[28] – she was undisputedly a "known temporary occupant" of Plaintiffs' property and thus had the authority to consent to another's entry under New Mexico law. *See Doe*, 2024 WL 4527750, at *5. Likewise, she was undisputedly "in occupancy of [Plaintiffs' property]" and manifested "intent to control it" when she invited Ms. Perez and Mr. Thompson onto the property and was thus a possessor according to the Restatement's definition of that term. Restatement (Second) of Torts § 157(a). In these circumstances, no reasonable factfinder could accept Plaintiffs' argument that Ms. Carroll lacked the ability to consent to others' entry onto their property.

Relatedly, Plaintiffs argue that Ms. Carroll exceeded the scope of any authority she had by granting Ms. Perez and Mr. Thompson permission to enter onto Plaintiffs' property, because she was contractually bound to forbid any visitors access to it. (Doc. 211 at ¶¶ 88-97.) But even if true,

---

[28] As noted in Section I., above, it is undisputed that Ms. Carroll had been living in Plaintiffs' house since 2014, had keys to the house, kept belongings there, and received mail and other deliveries there. These facts strongly suggest that Ms. Carroll was something more than a mere house sitter.

this argument fails to preserve Plaintiffs' trespass claims. An occupant is a possessor who can effectively consent to others' entry onto land even if her occupancy is wholly unauthorized. *See* Restatement (Second) of Torts § 157 cmt. b ("Possession of land may be acquired by one who is not by law entitled to it …. [A] disseisor is a possessor from the moment that his occupancy begins, although as between himself and the true owner, he is not entitled to possession until his adverse possession has ripened into ownership."). Thus, even if Ms. Carroll exceeded the scope of the authority Plaintiffs gave her over their property – indeed, even if they gave her no authority at all – she was still a possessor of the property vis-à-vis visitors like Ms. Perez and Mr. Thompson.

Plaintiffs' second argument – that their "no trespassing" sign trumps Ms. Carroll's consent – is also unavailing. Plaintiffs have pointed to, and I have located, no New Mexico law holding that a "no trespassing" sign voids a possessor's consent to a visitor's entry onto land and makes that entry a common law civil trespass. (*See generally* Docs. 211, 230-1.) Moreover, such a holding would lead to the absurd and unjust result of exposing all persons to tort liability for entering onto property posted with a "no trespassing" sign, even when the owner or occupier suing them undisputedly and unequivocally invited them to be there. In sum, it is undisputed that in December 2016, Ms. Carroll was a known occupant of Plaintiffs' property, had the ability to permit others to enter onto the property, and in fact gave Ms. Perez and Mr. Thompson consent to enter. Defendants are therefore entitled to summary judgment on Plaintiffs' trespass claims in Count 4.

2.     Trespass to Chattel and Conversion - Counts 5 and 6

Trespass to chattel is "the intentional use or interference with a chattel which is in the possession of another, without justification." *Texas-New Mexico Pipeline Co. v. Allstate Const., Inc.*, 1962-NMSC-026, ¶ 5, 369 P.2d 401, 402; *Escano v. ADT Sec. Corp.*, Civ. No. 24-908, 2025 WL 343112, at *2 (D.N.M. Jan. 30, 2025) (Riggs, J.). Conversion, in turn, is "the unlawful exercise

38

of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Nosker v. Trinity Land Co.*, 1988-NMCA-035, ¶ 15, 757 P.2d 803, 807–08. Conversion is an escalation of trespass to chattel, in which "the interference with the chattel is so serious that the actor may be required to pay the full value of the chattel." *Noriega v. Home Depot, USA, Inc.*, Civ. No. 11-91, 2011 WL 13284643, at *4 (D.N.M. Oct. 6, 2011) (Lynch, J.) (citing Restatement (Second) of Torts § 222A).

In Counts 5 and 6 of their operative complaint, Plaintiffs allege that Ms. Perez and Mr. Thompson committed trespass to chattel and conversion by removing the Cannes photograph and USMS badge from Plaintiffs' house. (Doc. 79 at ¶¶ 127-34.) Defendants argue that they are entitled to summary judgment on these claims because it is undisputed that neither Ms. Perez nor Mr. Thompson removed any personal property from the house. (Doc. 196 at 40-41.) As explained below, I agree.

As noted in Section I., Ms. Perez and Mr. Thompson declared that they did not remove the Cannes photograph, the USMS badge, or anything else from Plaintiffs' house. Moreover, it is undisputed that Plaintiffs have no personal knowledge of what Ms. Perez and Mr. Thompson did or did not remove because they were not present when Ms. Perez and Mr. Thompson were at the house. Nor have Plaintiffs submitted the testimony of anyone who was present, such as Ms. Carroll. Rather, Plaintiffs offer only their speculative belief that Defendants took the Cannes photograph and the USMS badge. *See Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (holding that, on summary judgment, "[e]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise").

Plaintiffs' belief that Defendants took the USMS badge, in particular, is far too speculative to support a claim of trespass to chattel or conversion. Both Plaintiffs testified that they do not know who took the USMS badge. Mr. Jacobs suggested that he only alleged Ms. Perez and Mr. Thompson did so to preserve a possible claim. And, Ms. Handler Jacobs acknowledged that there were others who could have taken it, and it was more likely Mr. Clark who did so. In these circumstances, no reasonable factfinder could possibly conclude that either Ms. Perez or Mr. Thompson committed trespass to chattel or conversion by taking the USMS badge.

Plaintiffs' arguments in support of their belief that Mr. Thompson removed the Cannes photograph from their house are more complex but ultimately fare no better. Initially, again, Mr. Thompson declared that he did not take the photograph from the house, and Plaintiffs submit no testimony to the contrary by anyone with direct personal knowledge of what he did or did not take. Rather, Plaintiffs appear to base their belief that Mr. Thompson removed the photograph primarily on the fact that it was gone when they came back to the house months or years later. But a reasonable factfinder could not conclude that Mr. Thompson took the photograph on that basis, because it is undisputed that Ms. Carroll, Mr. Clark, and others also had access to the house during Plaintiffs' protracted absence.

In response to Defendants' Motion and in Plaintiffs' proposed revised summary judgment motion, Mr. Jacobs does try to construct a stronger chain of inferences to support the conclusion that Mr. Thompson removed the Cannes photograph from the house. (Doc. 211-1 at 11-12; Doc. 230-1 at 22-23.) Specifically, Mr. Jacobs points to circumstantial evidence purporting to show that Mr. Thompson could not have produced the flat, reflection-free, shadow-free, undistorted photograph of the Cannes photograph that the *Journal* published without removing the Cannes photograph from the house. But two critical links in this inferential chain are missing.

First, Mr. Jacobs suggests that Mr. Thompson must have taken the Cannes photograph out of its frame before photographing it because, when Mr. Jacobs reprinted the photograph, put it in a different frame, and photographed the framed reprint, it was more cropped than, and showed glass reflections not present in, Mr. Thompson's photograph. (*See* Section I., *supra*.) In addition, Mr. Jacobs argues that when he photographed a reprint of the Cannes photograph in yet another frame from a different angle to eliminate the glass reflections, it was shadowed and distorted, while Mr. Thompson's photograph was not. (*Id.*)

Critically, however, Mr. Jacobs fails to present any evidence that the frame the Cannes photograph was in when Mr. Thompson photographed it was the same as or materially similar to either of the frames in which Mr. Jacobs photographed his reprints. For example, Mr. Jacobs presents no evidence regarding how much of the Cannes photograph the original frame would have cropped and whether its glass was non-reflective. Thus, even accepted as true, Mr. Jacobs' evidence fails to contradict Mr. Thompson's testimony that he did not remove the Cannes photograph from its frame if it was in one when he photographed it.

Second, Mr. Jacobs suggests that Mr. Thompson must have removed the Cannes photograph from Plaintiffs' house because he must have flattened it before he photographed it. In support, Mr. Jacobs presents evidence that, if the Cannes photograph was removed from its frame, it would have curved, while in Mr. Thompson's photograph it is flat. But even assuming Mr. Thompson did remove the photograph from its frame – which, as just discussed, Mr. Thompson denied and Mr. Jacobs' evidence fails to support – Mr. Jacobs presents no evidence to tending to show that Mr. Thompson would have had to remove the photograph from the house to flatten it. Thus, even viewing the record evidence in Plaintiffs' favor, there is insufficient evidence from which a reasonable factfinder could conclude that Mr. Thompson removed the Cannes photograph

41

from their house. For all of the above reasons, Defendants are entitled to summary judgment on Plaintiffs' trespass to chattel and conversion claims in Counts 5 and 6. *Cardoso*, 490 F.3d at 1197.

3.      Intrusion on Seclusion - Count 7

New Mexico courts have recognized intrusion on seclusion as a tort falling under the rubric of invasion of privacy. *See Fernandez-Wells v. Beauvais*, 1999-NMCA-071, ¶ 13, 983 P.2d 1006, 1009; *Moore v. Sun Pub. Corp.*, 1994-NMCA-104, ¶ 28, 881 P.2d 735, 743; *Smith v. City of Artesia*, 1989-NMCA-015, ¶ 6, 772 P.2d 373, 374; *McNutt v. New Mexico State Trib. Co.*, 1975-NMCA-085, ¶ 8, 538 P.2d 804, 807-08; *see also* Restatement (Second) of Torts § 652A(2)(a). New Mexico courts have not specifically defined the elements of an intrusion upon seclusion claim but have generally looked to the Restatement for guidance in defining invasion of privacy torts. *New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1123-1124 (D.N.M. 2020) (Vázquez, J.) ("*Tiny Lab*"), *on reconsideration*, 516 F. Supp. 3d 1293 (D.N.M. 2021).

According to the Restatement, a person commits intrusion on seclusion when he "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … [where] the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. Both the New Mexico courts and the Restatement recognize that an intrusion on seclusion turns on the manner in which the defendant intrudes, and not on what the defendant does with the information he obtains. *Fernandez-Wells*, 1999-NMCA-071, ¶¶ 13-14, 983 P.2d at 1009-10; Restatement (Second) of Torts § 652B cmts. a, b, d.

To be highly offensive to a reasonable person, an intrusion must involve some sort of reprehensible conduct, such as force, surreptitious conduct, or trickery. *See* Restatement (Second) of Torts § 652B cmt. b (giving examples of forcing one's way into a hotel room, eavesdropping, wiretapping, opening personal mail, or using a forged court order to gain access to documents as

42

highly offensive intrusions); *Tiny Lab*, 457 F. Supp. 3d at 1123, 1125-27 (holding that ad networks' surreptitious collection of minor app users' personal information could form basis of intrusion on seclusion claim). Federal courts applying New Mexico law have rejected intrusion on seclusion claims when there is no allegation or evidence that the defendant achieved the intrusion at issue by reprehensible means. *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1218 (10th Cir. 2007) (upholding dismissal of intrusion on seclusion claims where reporters filmed police officers after officers answered the door to their homes); *Poncho-Alderete v. United States Gov't*, Civ. No. 22-153, 2024 WL 2132394, at *16 (D.N.M. May 8, 2024) (Khalsa, J.) (granting defendants summary judgment on intrusion on seclusion claims where officers knocked on plaintiff's door and plaintiff voluntarily exited her home and spoke to them).

In Count 7, Plaintiffs allege that Ms. Perez and Mr. Thompson intruded on their seclusion by entering their house and observing the Cannes photograph, the USMS badge, a whiteboard with writing on it, and Ms. Carroll holding what appears to be a map. (Doc. 79 at ¶¶ 136-37.) In their Motion, Defendants argue that they are entitled to summary judgment on these claims because Plaintiffs cannot show that the manner in which Ms. Perez and Mr. Thompson gained access to the house and its contents would be highly offensive to a reasonable person. (Doc. 196 at 42-43.) In support, Defendants point to the undisputed facts that Ms. Carroll invited Ms. Perez and Mr. Thompson into the house and gave them unrestricted access while they were reporting on a newsworthy event. Plaintiffs counter that Ms. Perez and Mr. Thompson nevertheless intruded on Plaintiffs' seclusion because they "colluded" with Ms. Carroll and were "factually aware that [Ms.] Carroll did not own the house nor the items in it." (Doc. 211 at ¶ 172.)

In general, when a person voluntarily opens the door to a room or residence, the resulting "intrusion" is not highly offensive. *Alvarado*, 493 F.3d at 1218; *Poncho-Alderete*, 2024 WL

43

2132394, at *16. That principle applies here, even though it was Ms. Carroll who opened the doors at issue, because Plaintiffs present no evidence to show that Ms. Perez or Mr. Thompson used any force, surreptitious conduct, trickery, badgering, or other reprehensible means to get Ms. Carroll to grant them access. Instead, it is undisputed that Ms. Perez simply contacted Ms. Carroll and asked her for an interview. In these circumstances, Plaintiffs have failed to present any evidence from which a rational factfinder could conclude that Ms. Perez and Mr. Thompson gained access to Plaintiffs' house and its contents in a highly offensive way. Defendants are thus entitled to summary judgment on Plaintiffs' intrusion on seclusion claims in Count 7.

4.      Public Disclosure of Private Facts – Count 8

Under New Mexico law, public disclosure of private facts is another type of tortious invasion of privacy. *Fernandez-Wells*, 1999-NMCA-071, ¶ 7, 983 P.2d at 1008 (noting that New Mexico courts have recognized the cause of action but not addressed a case involving it). In *Fernandez-Wells*, the New Mexico Court of Appeals articulated the elements of the tort as "public disclosure of private facts, disclosure which would be objectionable to a reasonable person, and a lack of legitimate public interest in the information." *Id.* at ¶ 8, 983 P.2d at 1008.

Regarding the first element, *i.e.*, the objectively objectionable disclosure of private facts, a plaintiff must show the publication of "true but intimate or private facts about the plaintiff, such as matter concerning the plaintiff's sexual life or health." *Rostro v. Bd. of Cnty. Comm'rs of Eddy Cnty.*, Civ. No. 24-55, 2024 WL 4164997, at *2 (D.N.M. Sept. 12, 2024) (Gonzales, J.). Regarding the second element, *i.e.*, a lack of legitimate public interest in the information,

> [t]he line is to be drawn when the publicity ceases to be the giving of information
> to which the public is entitled, and becomes a morbid and sensational prying into
> private lives for its own sake with which a reasonable member of the public, with
> decent standards, would say that he had no concern.

44

*Alvarado*, 493 F.3d at 1219-20 (finding "allegations of police misconduct" to be of legitimate public interest); *see also, e.g., Fernandez-Wells*, 1999-NMCA-071, at ¶ 12, 983 P.2d at 1009 (finding outcome of professional disciplinary proceedings to be of legitimate public interest).

In Count 8 of their operative complaint, Plaintiffs allege that Defendants committed the tort of public disclosure of private facts. (Doc. 79 at ¶¶ 140-44.) These claims appear to be based on the *Journal*'s publication of Ms. Perez's article and Mr. Thompson's photographs of: (1) the Cannes photograph; (2) the USMS badge; (3) a whiteboard in Mr. Jacobs' office with writing on it; and, (4) Ms. Carroll holding what appears to be a map. (*Id.*) Defendants argue that they are entitled to summary judgment on these claims because Plaintiffs have failed to establish any of the essential elements of the tort. (Doc. 196 at 43-44.) Defendants are correct.

As discussed in Section I., the undisputed facts show that when the *Journal* published Ms. Perez's article and Mr. Thompson's photographs, Plaintiffs had been accused of defrauding investors of over $50,000,000 and indicted for federal white-collar crimes. Information about such suspected criminal activity is clearly "information to which the public is entitled" and is thus of legitimate interest to the public. *Alvarado*, 493 F.3d at 1219.

Further, although Plaintiffs allege that Mr. Thompson's photographs were "unrelated" to the criminal charges against them, (Doc. 79 at ¶ 141), they appear to have abandoned this position in their response to Defendants' Motion.[29] (*See* Doc. 211 at ¶¶ 173-74.) And even if they continued to pursue it, it would not assist them, because the only photograph that even arguably reveals "private facts" has an evident connection to the charges against them. Initially, the Cannes photograph clearly displays no private information; it shows nothing more than Plaintiffs posing

---

[29] Instead, in their response, Plaintiffs address whether Defendants published "private facts" about them and whether the publication of those facts would be objectionable to a reasonable person. (Doc. 211 at ¶¶ 173-74 (arguing that Defendants acknowledged the facts disclosed were private and that a nonparty news outlet reported on the whiteboard photograph in an "extremely disturbing" way).)

in front of two yachts in Cannes, France. (Docs. 196-1, 196-2.) The photograph of Ms. Carroll likewise reveals no private facts, merely showing Ms. Carroll in an office holding what appears to be a map. And the photograph of the USMS badge depicts a publicly issued badge and identification card and so cannot be considered private.[30]

This leaves the photograph of the whiteboard with writing on it. As discussed in Section I., the writing on the whiteboard includes references to Sri Lanka, one of the countries in which Plaintiffs allegedly committed criminal acts. It also includes notations about large sums of money, such as those involved in the alleged crimes. Thus, even if it were construed to reveal private facts, any reasonable factfinder would conclude that Defendants' publication of Mr. Thompson's photograph of it was of legitimate public interest rather than "a morbid and sensational prying into private lives for its own sake with which a reasonable member of the public, with decent standards, would say that he had no concern." *Alvarado*, 493 F.3d at 1219. For these reasons, Defendants are entitled to summary judgment on Plaintiffs' public disclosure of private facts claims in Count 8.

5.     Intentional Infliction of Emotional Distress – Count 9

Finally, in Count 9, Plaintiffs allege that Defendants intentionally inflicted emotional distress on them by (1) entering Mr. Jacobs' "private" office, (2) making "misleading or false statements of fact" in Ms. Perez's article, (3) failing to refer the legal presumption of innocence in the article, (4) failing to publish a follow-up article about the outcome of the criminal charges against them, (5) "falsely connect[ing]" the Cannes photograph with an alleged criminal activity," and (6) "disregarding" Mr. Jacobs' ownership of the Cannes photograph.[31] (Doc. 79 at ¶¶ 148-49; Doc. 211 at ¶ 176.)

---

[30] In addition, the fact that a person accused of multiple federal crimes previously worked for the United States Marshals Service is certainly of legitimate public interest.

[31] Plaintiffs also allege that Defendants intentionally inflicted emotional distress on them by trespassing, "rummag[ing]" through files, stealing personal property, and causing Ms. Carroll to violate her housesitting

To prove a claim of intentional infliction of emotional distress under New Mexico law, a plaintiff must show that:

> (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress.

*Baldonado v. El Paso Nat. Gas Co.*, 2008-NMSC-005, ¶ 27, 176 P.3d 277, 283.

"Accurate publication of newsworthy events does not give rise to a cause of action for intentional infliction of emotional distress." *Andrews v. Stallings*, 1995-NMCA-015, ¶ 56, 892 P.2d 611, 625; *see also Alvarado*, 493 F.3d at 1222-23 (collecting cases). This is true even when the reporting may have interfered with a plaintiff's business interests, *Andrews*, 1995-NMCA-015, ¶ 54, 892 P.2d at 625, or involves upsetting or embarrassing information. *Alvarado*, 493 F.3d at 1222; *Schuler v. McGraw-Hill Cos., Inc.*, 989 F. Supp. 1377, 1390-91 (D.N.M. 1997) (Campos, J.), *aff'd,* 145 F.3d 1346 (10th Cir. 1998).

Plaintiffs argue that Ms. Perez's article was not accurate because it stated that they allegedly defrauded investors "with the help of four other people," while the federal indictment indicated that the fraud "scheme was principally devised by [Rienzi] Edwards" with Plaintiffs' "assistance." (Doc. 211 at ¶ 178.) In fact, however, Ms. Perez's article correctly stated that, per the indictment, Mr. Edwards was the scheme's ringleader and Plaintiffs worked with Mr. Edwards and others to carry it out. (*See* Section I., *supra*.) As such, no reasonable factfinder could accept Plaintiffs' argument that the article was inaccurate.

---

agreement. (Doc. 79 at ¶ 148.) However, as discussed in Sections III.B.1. and III.B.2., above*,* no reasonable factfinder could conclude that any Defendant trespassed on Plaintiffs' property or stole their personal property; and, there is no cognizable evidence in the record that any Defendant rummaged through Plaintiffs' files or was responsible for Ms. Carroll's alleged decision to violate her housesitting agreement with Plaintiffs. In the absence of any factual support, these alleged acts cannot preserve Plaintiffs' intentional infliction of emotional distress claims.

Equally without factual foundation is Plaintiffs' allegation that Defendants falsely connected the Cannes photograph with criminal activity. On the contrary, as discussed in Section III.B.4.a., above, the *Journal*'s caption of the Cannes photograph did not connect the photograph with any criminal activity; rather, it simply indicated that the photograph depicted Plaintiffs and was found at their home. Of course, Ms. Perez's article did connect Plaintiffs with alleged criminal activity, but in light of the federal indictment and Plaintiffs' subsequent guilty pleas, no reasonable factfinder could conclude that the connection the article made was false. In short, as a matter of law, Defendants' article and caption about the Cannes photograph were accurate and cannot support Plaintiffs' intentional infliction of emotional distress claims.

The other acts on which Plaintiffs base their intentional infliction of emotional distress claims, in turn, are not sufficiently extreme or outrageous to sustain the claims. To support an intentional infliction of emotional distress claim, "conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Alvarado*, 493 F.3d at 1222. Here, no reasonable factfinder could conclude that Ms. Perez's failure to refer to the legal presumption of innocence, the *Journal*'s failure to publish a follow-up article about the outcome of the criminal charges against Plaintiffs, or Ms. Perez's and Mr. Thompson's entry into Mr. Jacobs' home office with Ms. Carroll's consent, satisfies this requirement.

Further, although infringing on another's copyright may expose the infringer to liability under the Copyright Act, Plaintiffs have not cited to, and I have not located, any New Mexico law holding that such infringement is, in and of itself, sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim. Nor do I recommend that the Court create such authority here. Even resolving all genuine factual disputes and drawing all reasonable

48

inferences in Plaintiffs' favor, the manner in which Defendants allegedly infringed on Mr. Jacobs' copyright in the Cannes photograph cannot reasonably described as "beyond all possible bounds of decency," "atrocious," or "utterly intolerable in a civilized community." *Alvarado*, 493 F.3d at 1222. For these reasons, Defendants are entitled to summary judgment on Plaintiffs' intentional infliction of emotional distress claims in Count 9.

## IV.    PLAINTIFFS' MOTIONS

Plaintiffs, in turn, have filed three motions now before the Court. Specifically, in their Motion (Doc. 213), Plaintiffs seek summary judgment on all of their claims, while in their Motion to Extend (Doc. 226) and Motion to Amend (Doc. 230), they initially sought an extension of time to reply in support of their Motion but have ultimately sought leave to file a proposed revised summary judgment motion instead. Thus, before analyzing whether Plaintiffs are entitled to summary judgment on any of their claims, I must first address whether the dispositive motion the Court should entertain is Plaintiffs' original Motion, or the proposed revised summary judgment motion attached to their Motion to Amend.[32] This question turns on the procedural history described below.

In a scheduling order entered on September 26, 2023, the Court set a deadline of March 29, 2024, for the parties to file dispositive motions. (Doc. 91 at 2.) Following several other extensions of case management deadlines, (*see, e.g.,* Docs. 116, 132, 142, 150, 159, 175, 178, 186), the Court extended the dispositive motions deadline to April 18, 2025. (Doc. 188.) Although Defendants filed their dispositive motion by this deadline, (Doc. 196), Plaintiffs did not. The Court then granted three requests by Plaintiffs to extend their dispositive motions deadline again. (Docs.

---

[32] In deciding this question, I am cognizant that a court must liberally construe a *pro se* plaintiff's pleadings but must not act as his advocate, *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005)*,* and that *pro se* plaintiffs must comply with the Federal Rules of Civil Procedure and simple, nonburdensome local rules. *Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994); *Bradenburg v. Beaman*, 632 F.2d 120, 122 (10th Cir. 1980).

49

197, 199, 201.) In response to Plaintiffs' fourth request to extend this deadline, (Doc. 203), the Court held a status conference on June 3, 2025. (Doc. 206.) At the status conference, Mr. Jacobs "represented that he would not request further extensions of time" if the Court gave Plaintiffs until June 23, 2025, to file dispositive motions. (Doc. 207 at 1.) "Based on that representation," the Court granted the requested extension. (*Id.*)

One day after the June 23, 2025 deadline, Plaintiffs filed their original Motion. (Doc. 213.) In it, Plaintiffs seek summary judgment on all of their claims but attach no exhibits, instead relying on other record evidence, including the exhibits to their response to Defendants' Motion. (*See generally id*.) Defendants responded to Plaintiffs' Motion on July 15, 2025, arguing that the Court should deny it because Defendants' Motion established their entitlement to summary judgment on all claims, and because Plaintiffs failed to show their entitlement to summary judgment on any of them. (Doc. 217.)

On August 6, 2025, Plaintiffs filed their Motion to Extend. (Doc. 226.) By this motion, Plaintiffs sought to extend their deadline to reply in support of their Motion for Summary Judgment to August 15, 2025. (*Id.*; Doc. 228 at 5.) But on August 20, 2025, Plaintiffs "chang[ed] tack" and, in lieu of filing a summary judgment reply, filed their Motion to Amend, to which they attached a proposed revised summary judgment motion. (Doc. 230 at 2; *see* Docs. 230-1 to 230-7.) The proposed revised motion is 47 pages longer than Plaintiffs' original Motion. (*Compare* Doc. 211 *with* Doc. 230-1.) Also, although Plaintiffs have attached no exhibits to the original Motion, they have attached 126 pages of exhibits to the proposed revised motion. (*Compare* Doc. 211 *with* Docs. 230-3 to 230-7.)

The proposed revised summary judgment motion Plaintiffs seek leave to file differs from their original Motion so comprehensively that it is, in fact, an entirely new dispositive motion.

Thus, and because they did not file their Motion to Amend until August 20, 2025, the Court would have to reopen Plaintiffs' June 23, 2025 dispositive motions deadline to allow them to file it. This, in turn, would require a showing of good cause and excusable neglect.[33] Fed. R. Civ. P. 6(b)(1)(B), 16(b)(4); *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014); *Utah Republican Party v. Herbert*, 678 F. App'x 697, 700 (10th Cir. 2017).

Good cause and excusable neglect, "although interrelated, are not identical and … 'good cause' requires a greater showing than 'excusable neglect.'" *In re Kirkland*, 86 F.3d 172, 175 (10th Cir. 1996). To show good cause to extend a scheduling order deadline, a movant must establish that the deadline "cannot be met despite the movant's diligent efforts." *Gorsuch, Ltd.*, 771 F.3d at 1240 (brackets omitted). For example, a movant may show good cause when he "learns new information through discovery" or "the underlying law has changed." *Id.*

Excusable neglect

> depends on four factors: [1] the danger of prejudice to the non-moving party, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.

*Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017) (quotation marks and brackets omitted). Here, as explained below, Plaintiffs offer several reasons for their failure to timely file their proposed revised summary judgment motion, but none of these reasons show good cause or excusable neglect.

First, Plaintiffs allege that Ms. Handler Jacobs "was ill for most of 2024" with "an unknown medical condition," and was hospitalized from about April 19, 2025 to May 3, 2025,

---

[33] Of course, Plaintiffs would also have been required to show good cause for the Court to extend their deadline to file a reply in support of their original Motion, had they not decided to seek leave to file a revised summary judgment motion instead. But as it is, Plaintiffs' Motion to Amend their original Motion has superseded their Motion to Extend the deadline to file a summary judgment reply. (Doc. 230 at 2.) Plaintiffs' Motion to Extend (Doc. 226) is therefore moot and should be denied as such.

with pneumonia, and from about May 31, 2025 to June 21, 2025, with a collapsed lung. (Doc. 230 at 5.) Initially, I note that Plaintiffs submit no evidence to support these allegations. (*See generally* Docs. 230, 235.) But even if the Court were to accept them as true, they do not rise to the level of good cause and excusable neglect in the particular circumstances presented here.

Though grave, Ms. Handler Jacobs' alleged medical crises do not show that Plaintiffs made diligent efforts to file their Motion to Amend by June 23, 2025, as would be required to show good cause. Plaintiffs indicate that Mr. Jacobs, and not Ms. Handler Jacobs, has "largely prepared all of the court documents required" in this case. (Doc. 230 at 5.) And Ms. Handler Jacobs was deposed, and her testimony thus preserved, in early January 2024. (Doc. 196-4.) As such, it appears that Mr. Jacobs did not need Ms. Handler Jacobs' assistance to prepare a properly supported summary judgment motion and could have done so even though she was too ill to help him for most of 2024 and several weeks in April through June 2025.

Mr. Jacobs does argue that he spent many hours with Ms. Handler Jacobs every day she was in the hospital. (Doc. 230 at 5.) And of course, his decision to be with his wife during her hospitalizations cannot be faulted. But before Ms. Handler Jacobs' first hospitalization on April 19, 2025, Plaintiffs had already received well over a year's worth of extensions to file a dispositive motion; and, between the first hospitalization and Plaintiffs' June 23, 2025 deadline, there were another 30 days when Ms. Handler Jacobs was not in the hospital. Mr. Jacobs' decision to use that time to, *e.g.*, "do[] all of the chores at [Plaintiffs'] home" rather than prepare a properly supported summary judgment motion cannot be described as diligent, especially given the Court's clear warning that it would grant no further extensions. Also, I note that Plaintiffs continued to act less than diligently when they waited for some 60 days after Ms. Handler Jacobs last left the hospital on about June 21, 2025 before filing their Motion to Amend. For these reasons, Ms. Handler

52

Jacobs' alleged medical problems do not establish good cause for Plaintiffs' failure to file their proposed revised summary judgment motion by June 23, 2025.

As their second reason for failing to timely file their proposed revised motion, Plaintiffs allege that Mr. Jacobs suffers from psychological impairments for which he receives medical treatment and that he had to be deposed in two sessions because he suffered a "psychotic snap" during the first session. (Doc. 230 at 5; Doc. 230-1 at 47.) But Defendants deposed Mr. Jacobs on January 12, 2024, and March 15, 2024, well over a year before Plaintiffs' June 23, 2025 dispositive motions deadline. (Doc. 196-3 at 1, 19.) Thus, the need for him to be deposed in two sessions plainly did not contribute to Plaintiffs' failure to file their proposed revised motion by that deadline. Nor do Plaintiffs explain how Mr. Jacobs' psychological impairments otherwise operated to prevent him from timely filing the proposed revised motion. (*See generally* Docs. 230, 235.)

Third, Plaintiffs suggest that they delayed in filing their proposed revised summary judgment motion because the *Journal* did not remove the Cannes photograph from its Facebook page until July 2025, and Plaintiffs did not know "about the timing" of Ms. Perez's interview of Ms. Carroll until Defendants filed Ms. Perez's declaration on April 18, 2025. (Doc. 230 at 2.) However, Defendants filed Ms. Perez's declaration over two months before Plaintiffs' June 23, 2025 motions deadline; and, Plaintiffs wholly fail to explain, nor is it evident, why they could not file a properly supported summary judgment motion until the *Journal* removed the Cannes photograph from its Facebook page.

Finally, Plaintiffs blame "the current delays" on Defendants' August 6, 2025 refusal to agree to page and time limit extensions for Plaintiffs' reply in support of their original Motion, which refusal "forced" Plaintiffs "to change tack" and file their Motion to Amend instead. (*Id.*) But even if Plaintiffs were entitled to presume that Defendants would always agree to their requests

53

for extensions of time and page limits, which is doubtful, the comprehensive new arguments and evidence presented in Plaintiffs' proposed revised summary judgment motion would have been equally improper if presented for the first time in a reply in support of their Motion. *See Santa Fe Goldworks, Inc. v. Bella Jewelry, LLC*, Civ. No. 23-602, 2024 WL 3161893, at *7 (D.N.M. June 25, 2024) (Khalsa, J.) ("[C]ourts generally do not consider new arguments or evidence presented for the first time in a reply.") (citing cases); *see also United States v. Moya-Breton*, 439 F. App'x 711, 715 (10th Cir. 2011) (noting that ordinarily, issues raised for first time in reply brief are deemed waived). In short, none of the reasons Plaintiffs have proffered show good cause for their failure to file their proposed revised summary judgment motion by June 23, 2025.[34]

Additionally, having considered the factors relevant to excusable neglect, I note that permitting Plaintiffs to file their proposed revised summary judgment motion out of time would further delay these proceedings and unfairly prejudice Defendants. *Perez*, 847 F.3d at 1253. This case is nearly five years old; the Court has already granted Plaintiffs over a year's worth of extensions of their dispositive motions deadline; and, the Court clearly advised the parties that it would not extend the June 23, 2025 deadline again. Further, Defendants have spent significant time and money briefing their Motion and responding to Plaintiffs' Motion as it was originally filed. (*See* Docs. 196, 217, 218.) To require Defendants to spend yet more time and money to substantively address Plaintiffs' proposed revised summary judgment motion at this juncture would further delay the ultimate resolution of this protracted litigation and would be both harmful and unjust. For all of the above reasons, the Court should deny Plaintiffs' Motion to Amend and

---

[34] Plaintiffs also argue that the Court should grant their Motion to Amend because, under Federal Rule of Civil Procedure 15, courts should freely give leave to amend pleadings when justice so requires. (Doc. 230 at 3); *see* Fed. R. Civ. P. 15(a)(2). But Rule 15 applies to amendments to "pleadings," not to motions. *Id.*; *see* Fed. R. Civ. P. 7(a).

54

look to Plaintiffs' original Motion to decide whether they are entitled to summary judgment on any of their claims.[35]

Turning, then, to the merits of Plaintiffs' Motion, as discussed in Section III., above, Defendants have shown that they are entitled to summary judgment on all of Plaintiffs' claims except for Mr. Jacobs' (a) direct infringement claims for injunctive relief against the *Journal*, Mr. Thompson, Mr. Lang, and Mr. Walz, and (b) contributory infringement claim for injunctive relief against the *Journal* based on nonparty Zuma's alleged direct infringement. For the reasons discussed in Section III., Plaintiffs have failed to show that they are entitled to a judgment as a matter of law on the claims on which Defendants have prevailed.

In addition, Mr. Jacobs has failed to meet his burden to show that he is entitled to a judgment as a matter of law on his surviving copyright claims. *Donner*, 778 F.3d at 876. Among other things, the record does not unequivocally show that Mr. Jacobs is the author of the Cannes photograph or the owner of its copyright, nor does it establish that Mr. Lang and Mr. Walz participated in the *Journal*'s alleged infringement of the copyright as a matter of law. Also, as discussed in Section III.B.1., above, there remain genuine issues of material fact regarding whether Defendants' use of the Cannes photograph was a fair use. I therefore recommend that Plaintiffs' Motion be denied.

## V.   CONCLUSION

A.   For the reasons set forth in Section III., above, I RECOMMEND that the Court GRANT Defendants' Motion for Summary Judgment (Doc. 196) to the extent that Defendants seek summary judgment on Plaintiffs' claims for:

---

[35] However, as noted in Section I., above, I have considered the exhibits attached to Plaintiffs' proposed revised summary judgment motion in analyzing the parties' respective Motions.

1. In Counts 1 and 2 of the operative complaint:

   a. All of Ms. Handler Jacobs' claims for direct and contributory copyright infringement;

   b. All of Mr. Jacobs' direct and contributory copyright infringement claims for statutory damages, punitive damages, attorney's fees, actual damages, and profits;

   c. Mr. Jacobs' direct copyright infringement claims for injunctive relief against Ms. Moses and Mr. Hanson; and,

   d. All of Mr. Jacobs' contributory copyright infringement claims for injunctive relief, with the sole exception of his contributory copyright infringement claim for injunctive relief against the *Journal* based on nonparty Zuma's alleged direct copyright infringement;

2. In Count 3, all of Plaintiffs' claims under 17 U.S.C. § 1202(a) of the DMCA; and,

3. In Counts 4 through 9, all of Plaintiffs' tort claims.

B. I further RECOMMEND that the Court DENY Defendants' Motion (Doc. 196) to the extent that Defendants seek summary judgment on:

1. In Count 1 of the operative complaint, Mr. Jacobs' direct copyright infringement claims for injunctive relief against the *Journal*, Mr. Thompson, Mr. Lang, and Mr. Walz; and,

2. In Count 2 of the operative complaint, Mr. Jacobs' contributory copyright infringement claim for injunctive relief against the *Journal* based on nonparty Zuma's alleged direct copyright infringement.

C. Finally, as set forth in Section IV., above, I RECOMMEND that the Court:

1.    DENY Plaintiffs' Motion for Summary Judgment (Doc. 213);

2.    DENY AS MOOT Plaintiffs' Amended Motion to Extend the Deadline by One Day to File Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment Due to Continued Medical Emergency and Opposing Counsel's Last Minute Denial of Plaintiffs' Page Count Request (Doc. 226); and,

3.    DENY Plaintiffs' Motion for Leave to Amend Motion for Summary Judgment (Doc. 230).


_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**